Argued April 2, affirmed as modified August 2, 1973

MELMS ET AL, *Respondents, Cross-Appellants, v.*
MITCHELL, *Appellant, Cross-Respondent.*

512 P2d 1336

*Robert C. Robertson* of Van Dyke, DuBay, Robertson & Paulson, P.C., Medford, argued the cause and filed briefs for appellant, cross-respondent.

*Thomas C. Howser* of Cottle & Howser, Ashland,

argued the cause and filed a brief for respondents, cross-appellants.

McALLISTER, J.

This is a suit for rescission of a contract in which defendant agreed to sell and plaintiffs to purchase a cordwood business, including hardwood stumpage growing on defendant's land and certain equipment used in cutting and hauling the wood. Defendant appeals from a decree of rescission and a money judgment for plaintiffs. Plaintiffs cross-appeal, contending that they were entitled to recover certain items of damage not allowed by the trial court.

In 1962 defendant and his wife had purchased a hillside tract of 179 acres in Jackson County covered with laurel, oak and other indigenous hardwood. Shortly thereafter defendant in his spare time began to thin the trees on the property in order to develop it for resale and later began to sell the wood resulting from his thinning program. Defendant retired from the military service in May 1968 and thereafter spent most of his time in cutting and selling cordwood.

In July 1969 defendant sustained an accidental injury which prevented him from continuing to cut wood and he decided to sell his cordwood business. He advertised the business for sale and in mid October 1969 plaintiffs responded to his advertisement. After brief negotiations the parties on October 18, 1969, signed a written agreement wherein the defendant agreed to sell to plaintiffs his wood business, including a dump truck, a jeep, two saws, a trailer, a grader and 20 cords of wood for $2,000. The contract further provided that defendant was to sell plaintiffs hardwood

stumpage at $2.50 per cord payable "in 100 cord increments (in advance) based on estimated production of 1,000 cords per year."[1] Plaintiffs paid the $2,000 in full and also paid defendant $100 for a gas tank containing some gasoline and $250 for the first 100 cords of wood to be cut.

---

[1] The written contract reads as follows:

| | Sale of Wood Business |
|---|---|
| Dump Truck | 1,000.00 |
| Jeep | 500 |
| Buzz Saw | 200 |
| Buzz Saw | 50 |
| Trailer | 50 |
| Grader | 100 |
| Inventory 20 cords at 15 | 300 |
| | $2,200 at $2,000 |

Customer List )
and Current Orders ) No Charge

Hardwood Stumpage at 2.50 per cord payable in 100 cord increments (in advance) based on estimated production of 1,000 cords per year. Cutting rights belong to buyer regardless of any or all transfer of ownership of land.

Buyer insure for all liabilities of operation and maintain roads used in business.

Seller to grant use of existing roads and jeep and cat trails to buyer for access to hardwood (and work center for area of operation and vehicle and equipment storage)

(State Land Lease)
Option?

Hardwood cutting to be on a thinning basis i.e. leaving a tree per 30 to 50' adequate to provide shade for regrowth

| *Seller* | *Buyer* |
|---|---|
| Raymond L. Mitchell | Byron F. Melms |
| (signature) | (signature) |

Cutting & thinning provisions at $2.50 per cord are on an annual contract basis mutually renegotiable as to price, quantity and conditions each year with renewable option for 4 years after the first year.

We have omitted certain notations on the contract which were apparently made after it was signed. Neither party claims that these notations constitute part of the agreement.

The day after the contract was signed the plaintiffs took over the wood business and commenced to cut and sell wood from defendant's property. Plaintiff Ells devoted full time to the business and Melms worked part time. From the beginning they encountered difficulties and were never able to cut and sell enough wood to make a profit. Because of the lack of income Ells quit cutting wood full time late in December 1969, but Melms continued to carry on the business for another month.

In the meantime defendant became dissatisfied with the way plaintiffs were cutting wood and with their failure to account, to his satisfaction, for the wood as they cut it. By letter dated January 18, 1970, defendant suspended plaintiffs' cutting rights and stated that the cutting rights would be terminated as of February 18 unless certain conditions specified in the letter were met. On January 26, 1970, plaintiff Melms called on defendant and notified him that plaintiffs were rescinding the contract. Defendant refused to agree to a rescission.

Plaintiffs then filed this suit, alleging in their complaint that they were induced to enter the contract by certain material misrepresentations made by defendant, and praying for a decree of rescission. The trial court specifically found that defendant made no material misrepresentations, but decreed rescission on the ground that defendant had committed a material breach by his suspension and threatened termination of plaintiffs' cutting rights. Defendant contends that it was improper to grant plaintiffs relief on grounds not pleaded in the complaint. We do not reach this question, however, because we are convinced, after examination of all the evidence, that plaintiffs were

entitled to relief on one of the grounds specified in their complaint.

Plaintiffs alleged, and defendant admitted, that prior to the execution of the contract defendant stated to plaintiffs that his property contained "a large number of cords of dry wood suitable for immediate cutting and sale." The testimony shows that this representation was made as part of a discussion of the operation of the cordwood business in which defendant told plaintiffs that cordwood was customarily sold in a mixture of one-half dry wood and one-half green wood. This practice was confirmed by other evidence. Plaintiffs were thus led to believe that defendant's property contained enough dry wood to enable them to cut, for immediate sale, wood in a marketable mixture.

As plaintiffs had purchased from defendant 20 cords of dry wood already cut and stacked, they had no immediate need to search for dry wood for cutting. They used this 20 cords, mixed with the green wood which they began to cut, to fill ther orders. When that 20 cords was gone, however, they began to have difficulties.

Although the evidence does not precisely define the dry wood which plaintiffs were told was on the property, it appears that the parties were concerned with standing trees or parts of trees which were dead but still sound; the laurel, especially, tended to grow in clumps, and some of these clumps contained an occasional dead trunk that was dry and suitable for firewood. Plaintiffs discovered, however, that in the areas where defendant had asked them to begin cutting, there was not enough suitable dry wood to enable them to cut one-half dry and one-half green at the rate necessary to fill current orders. They attempted to find dry

wood in greater quantities in other areas on defendant's land. These efforts were time-consuming, as plaintiffs had to clear access roads into the new areas, and the quantities of dry wood they found were not great enough to justify the time spent in developing access into these areas. When plaintiffs complained to defendant about the lack of dry wood, he assured them that the wood was there if they would just go and get it. Their continuing efforts were, however, unsuccessful and plaintiffs eventually found it necessary to purchase approximately 20 cords of cut dry wood, at $15 a cord, from another source in order to meet their customers' demands.

■ We are of the opinion that the evidence shows that defendant's representation as to the quantity of dry wood available was both false and material. We are convinced by the above evidence that the available dry wood on the property was insufficient for the current operation of the business, which was offered to the plaintiffs as a going business with orders waiting to be filled. Plaintiffs were told that the orders were to be filled with about fifty per cent dry wood, and that on defendant's property there were large or substantial quantities of dry wood suitable for immediate cutting and sale. Plaintiffs reasonably understood defendant's statement to mean that the quantity of dry wood was sufficient to enable them to fill current orders with a proper proportion of dry wood. Without dry wood in that quantity, plaintiffs would have to purchase dry wood elsewhere, as they did, or curtail immediate sales while they cut and stockpiled green wood to dry out for sale the following year. There was no understanding at the time of the sale that such a delay and long-term investment would be required.

Having determined that there was a material mis-

representation as to the amount of available dry wood, we turn to the question of the applicable law.

■■ Although the trial court held otherwise, we are of the opinion that this transaction is governed by the Sales Article of our Commercial Code (ORS Chapter 72). ORS 72.1020 provides:

> "Unless the context otherwise requires, ORS 72.1010 to 72.7250 apply to transactions in goods; * * *"

"Goods" are defined in ORS 72.1050 (1):

> " 'Goods' means all things * * * which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action. 'Goods' also includes * * * growing crops and other identified things attached to realty as described in ORS 72.1070 on goods to be severed from realty."

ORS 72.1070 (2) provides:

> "A contract for the sale apart from the land of * * * timber to be cut is a contract for the sale of goods within ORS 72.1010 to 72.7250 whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance."[2]

The contract in the present case covered certain equipment and existing inventory of cut wood, as well

---

[2] In the present case the specific trees to be cut were not to be identified prior to their severance by plaintiffs. As to the wood to be cut, the contract was not, therefore, a present sale, but a contract to sell "future" goods. ORS 72.1050, 72.1060. Both present sales of goods and contracts to sell future goods are within the scope of Chapter 72, which applies to "transactions" in goods. ORS 72.1020.

as wood to be cut. The trial court was of the opinion that the contract was, however, not a sale of goods, but a contract for the sale of a going business. The written contract is headed "Sale of Wood Business," but the entire purchase price is allocated by its terms among the various items of tangible property which are within the statutory definitions of goods. The Code makes no exception for sales of goods which are the assets of a going business.

In the only case which we have found in which a similar question was decided under the Uniform Commercial Code, it was held that the Code applies to the tangible assets of a business. In *Foster v. Colorado Radio Corporation*, 381 F2d 222 (10th Cir 1967) the court held that even though the main purpose of the contract in issue was the transfer of a radio station as a going concern, the sale of those assets which were within the Code's definition of "goods" was governed by the provisions of the Sales Article. This court reached a similar conclusion in *Allen v. Baker*, 109 Or 443, 447, 220 P 574 (1923), where it was held that the inventory of a going business, specifically itemized in the contract for sale of the business, constituted "goods" under the provisions of the Uniform Sales Act.[9]

Many of the principles of law governing this case were considered in *Lanners v. Whitney*, 247 Or 223, 428 P2d 398 (1967), which involved material misrepresentations of the condition of an aircraft. We deter-

---

[9] Section 76 (1) of the Sales Act defined "goods" as follows:
 " 'Goods' include all chattels personal other than things in action and money. The term includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale."

mined that ORS 72.6080 was applicable. That section provides:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

\* \* \* \* \*

"(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it."

In *Lanners,* as in this case, the buyer notified the seller, after learning of the misrepresentation, that he considered the contract at an end. We held this notice to be adequate under ORS 72.6080:

"Notice that a party intends to consider a contract at an end or terminated amounts to a revocation of acceptance, and preserves to the plaintiff the remedies outlined in ORS 72.7110, including that of cancellation. We hold that plaintiff's notice of 'rescission' to which we have referred, reasonably informed defendant of his intent to terminate the contract and was sufficient to constitute a revocation of acceptance. ORS 71.2010 (26)." 247 Or at 234.

■ Defendant contends that plaintiffs' notice was not proper, because it included a demand for damages, and because plaintiffs offered only to return the "equipment", and did not mention the gasoline and the cut wood which had been included in the sale. Plaintiff Melms testified that he told defendant:

"\* \* \* I said 'In line with what has happened

here and the statement you have made I have no other choice at this time than to rescind the contract between Mr. Ells, myself and you and demand my money back, all monies paid to you for the equipment at such time that this is paid plus $2,000 damages which we have sustained to this point. I will deliver your equipment back to you and the contract will be at an end.' "

The Code does not include a requirement that a buyer who seeks to recover the purchase price must restore what he has received under the contract. We have no doubt, however, that such restoration is encompassed within the concept of revocation of acceptance, and that equitable principles, which supplement the Code's provisions, demand that a buyer seeking cancellation on the grounds of misrepresentation should return what he has received. See ORS 71.1030; 2 Anderson, Uniform Commercial Code 422.

 This court has followed the rule that a plaintiff who seeks rescission in equity need not prove a prior tender or offer to restore the benefits received under the contract because, by resorting to equity, he indicates his willingness to do equity. *Federici v. Lehman,* 230 Or 70, 73-74, 368 P2d 611 (1962); *Larsen v. Lootens,* 102 Or 579, 598-601, 194 P 699, 203 P 621 (1922). The demand for damages did not render plaintiffs' revocation ineffective. The Code provides that the remedy of cancellation does not preclude recovery of damages in appropriate cases:

"Remedies for material misrepresentation or fraud include all remedies available under ORS 72.1010 to 72.7250 for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy." ORS 72.7210.

If plaintiffs' notice was inadequate for a failure to offer to return all goods purchased under the contract upon payment of a proper amount, plaintiffs' submission to the jurisdiction of equity constitutes an adequate offer to do so.

Defendants also contend that plaintiffs' notice was not timely. What is a "reasonable time" under ORS 72.6080 (2), supra, depends upon the facts of the particular case. See ORS 71.2040 (2). The Official Comments to UCC 2-608 (ORS 72.6080) state, as to revocation of acceptance:

> "* * * Since this remedy will be generally resorted to only after attempts at adjustment have failed, the reasonable time period should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance and beyond the time for rejection after tender. * * *" Comment 4 to UCC 2-608.

■ Under the circumstances of this case, we cannot hold that plaintiffs allowed an unreasonable length of time to pass before notifying defendant of their revocation. Because of the very nature of the transaction—a sale of standing wood—it is only to be expected that plaintiffs might not discover right away that the quantity of dry wood was not as represented. Moreover, they had purchased 20 cords of cut wood, which they used to fill their first orders and thus had no reason immediately to seek out the standing dry wood. When they did begin looking for dry wood, and did not find the quantity they had been led to expect, they investigated other areas of defendant's land. These investigations, in some instances, required the cutting of new roads for access. When they began to feel that the dry wood was not available in the quantity

which defendant had represented, they spoke to defendant about the problem and he assured them that the wood was there. In *Brown v. Hassenstab,* 212 Or 246, 255, 319 P2d 929 (1957), we recognized that the seller's continued assurances that his representations are true can excuse the buyer's delay in terminating the contract. Under the facts and circumstances of this case, we do not believe plaintiffs were guilty of unreasonable delay.

■ Defendant also contends that plaintiffs, in January, were in default under the contract, and therefore were not entitled to rescind. We have reviewed the evidence with care, and we agree with the trial court's finding that plaintiffs were not in default. We also believe, as did the trial court, that defendant himself breached the contract by denying plaintiffs the right to continue cutting. As this breach was not pleaded by plaintiffs, and as there was no motion to amend the pleadings to conform to the proof, we do not rest our decision on that ground.

■ The remaining questions raised by the parties have to do with the amount of the judgment. The trial court allowed the plaintiffs $2,350, the total purchase price, plus interest at six per cent from January 26, 1970 (the date of notice of revocation), plus $792 representing storage expense for the equipment at the rate of $1.50 per day from January 26 to the date of trial. Defendant objects to the allowance of interest and storage charges.

ORS 82.010 provides that interest at the legal rate is payable on all moneys after they become due. Applying this statute in rescission cases, this court has held that the money paid by a rescinding purchaser is due on the date its return is demanded, and that in-

terest is properly allowed from that date. *Schuler v. Humphrey,* 198 Or 458, 496-97, 257 P2d 865 (1953); *Widmer v. Leffelman,* 196 Or 401, 408, 249 P2d 476 (1952); *Weiss and Hamilton v. Gumbert,* 191 Or 119, 141-143, 227 P2d 812, 228 P2d 800 (1951). We reached a similar result under the Code in *Lanners v. Whitney,* supra, 247 Or at 237, in which we also held that the purchaser was entitled to recover storage costs. In the present case, although notice of revocation of acceptance was given on January 26, plaintiffs did not make an effective offer to return the goods upon refund of the purchase price until they filed their complaint. Under these circumstances, we are of the opinion that both the interest and the storage charges should begin to run on the date the complaint was filed rather than on January 26 as held by the trial court.

■ Plaintiffs contend that they are entitled to recover the cost of "cover"—the dry wood they had to buy in order to fill their customers' orders—under ORS 72.7120, which provides:

"(1) After a breach within ORS 72.8110 the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in ORS 72.7150, but less expenses saved in consequence of the seller's breach.

Plaintiffs purchased 20 cords of cut dry wood for $303. Their contract with defendant called for payment of $2.50 a cord for stumpage. The difference between the cost of cover and the contract price is $253 — $303,

less $50 for 20 cords at $2.50. From this figure the statute provides for a deduction for "expenses saved in consequence of the seller's breach." Plaintiffs, when they purchased cut wood in order to fill their orders, were saved the expense of cutting and handling wood on defendant's land. There is no evidence of plaintiffs' own cutting and handling costs. The only evidence on this subject is that defendant, while he operated the business, estimated his expenses at $10 a cord for cutting and $5 a cord for other expenses. If plaintiffs' costs were similar, the expenses saved by buying 20 cords of cut wood would have been $300, or more than the difference between the cost of cover and the contract price. In short, the record does not show that plaintiffs suffered any damage by reason of their purchase of cut dry wood as cover.

Plaintiffs also argue that they are entitled to recover, as consequential damages under ORS 72.7150 (2), the wages they lost in order to devote their time to the cordwood business and their anticipated profits which failed to materialize. The lost wages are not a consequence of defendant's misrepresentation and cannot be recovered. If the quantity of dry wood had been as defendant represented, plaintiffs would have had to either give their own time to the business or hire others to do so.

Plaintiffs' real complaint is that the business failed to make a profit. We have no doubt that lost profits may, as plaintiffs contend, be recovered as consequential damages under ORS 72.7150 (2) in proper cases, but we find no basis for such an award in the present case. Both of the plaintiffs were inexperienced in the cordwood business. Although the record does provide some evidence of defendant's

profit per cord while he was operating the business, we cannot assume that plaintiffs' failure to make the same profit was due entirely or primarily to the lack of a sufficient quantity of available dry wood. Considering the type of business involved, plaintiffs' inexperience, and the lack of detailed evidence on cost and profit factors, the record is insufficient to support on award for loss of anticipated profits. See *Verret v. Leagjeld,* 263 Or 112, 501 P2d 780 (1972); *Douglas Const. v. Mazama Timber Products, Inc.,* 256 Or 107, 471 P2d 768 (1970).

The decree will be modified to provide that plaintiffs shall recover interest and storage charges from the date the complaint was filed; except as modified, the decree of the trial court is affirmed.