Argued and submitted July 15, reversed November 23, 1983

OAKRIDGE CABLEVISION, INC.,
*Respondent,*
*v.*

FIRST INTERSTATE BANK OF OREGON,
*Appellant.*

(A8106-03945; CA A24879)

673 P2d 532

James H. Clarke, Portland, argued the cause for appellant. With him on the briefs was Spears, Lubersky, Campbell & Bledsoe, Portland.

G. Kenneth Shiroishi, Morrison, Dunn, Carney, Allen & Tongue, Portland, argued the cause for respondent. On the brief were Chris L. Mullmann, Steven D. Stadum and Ragen, Roberts, O'Scannlain, Robertson & Neill, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiff brought this declaratory judgment action seeking a determination that a written agreement for the sale of assets of a sole proprietorship entitles plaintiff to the cash assets of the business. After a trial without a jury, the court agreed and entered judgment for plaintiff for $31,800, plus costs and attorney fees. Defendant appeals, contending that the sales agreement was the complete and exclusive statement of the parties, that the trial court erred in admitting parol evidence to supplement the agreement and that, under the terms of the agreement, defendant is entitled to judgment. We agree and reverse.

Dale Randolph Clark operated Northwest Cable TV Company as a sole proprietorship until his death in October, 1977, after which defendant, as personal representative of the deceased's estate and trustee of the Dale Randolph Clark trust, operated the business and offered it for sale. On October 23, 1980, defendant and plaintiff entered into a written earnest money agreement for the sale of "all of the assets of Northwest Cable TV." The agreement, however, was "subject to" the parties entering into a formal purchase and sale agreement. After several months of negotations, on February 10, 1981, the parties entered into a written contract for the sale of the assets of Northwest, relevant portions of which follow:

"* * * Seller's operation of the cable television system is pursuant to a granted franchise. The franchise together with all assets, contracts, leases, rights and goodwill used by Seller in connection with the operation of the cable television system are hereinafter collectively referred to herein as 'the System'.

"Seller desires to sell, and Buyer desires to buy the System as provided for in this Agreement.

"THEREFORE, in consideration of the purchase price to be paid the Seller and the parties' mutual promises made herein, the parties agree as follows.

"1. *Assets Sold and Purchased.* Subject to the conditions hereinafter set forth, Seller agrees to sell, assign and transfer, and Buyer agrees to buy, the following assets:

"(a) All franchises and franchise applications filed for operation of the System as set forth in *Exhibit A* attached.

"(b)   All real and personal property owned or used by Seller in connection with the operation of the System, as set forth in *Exhibit B* attached.

"(c)   All contracts, leases and agreements affecting the ownership or operation of the System, including all use permits from the U.S. Forest Service and pole attachment agreements, all as listed in *Exhibit C* attached.

"(d)   All subscriber agreements and orders for cable television service to be provided by the System existing at the Closing Date.

"(e)   All goodwill, trademarks, service marks, copyrights, trade names and common law property rights owned by Seller pertinent to the System, and used by Seller in connection with it.

"(f)   All of Seller's schematics, blueprints, engineering data, customer lists and other technical information relating to the System.

"The purchase of the System and all assets thereof shall be reflected in a Bill of Sale to be executed by the parties at the closing in the form attached hereto as *Exhibit D*.

"* * *

"3.   *Adjustments.* All property taxes and assessments (except assessments for improvements which have become a lien prior to the Closing Date, which will be paid by Seller), association dues, rents, pole rentals, insurance premiums, prepaid subscriber fees, payments of liens as provided in Section 6(e) hereof, and operating income and expenses for the System, shall be prorated as of 12:00 midnight of the Closing Date. Settlement between the parties of all prorated items shall take place on the 60th day next following the Closing Date, or the next succeeding business day if the 60th day is a Saturday, Sunday or legal holiday.

"* * * * *

"5.   *Conditions of Buyer's Obligations.* The obligations of Buyer to be performed under this Agreement on the Closing Date are expressly conditioned upon the performance of the following conditions:

"* * * * *

"(b)   Between the date of this Agreement and the Closing Date, there shall have been no material adverse change in the financial condition, assets or business of Seller from that reflected in the Seller's balance sheet of December 30, 1980

attached hereto as Exhibit E (the 'latest balance sheet'), and Seller shall not have suffered any material loss by fire or other casualty not substantially covered by insurance.

"* * * * *

"6. *Seller's Representations, Warranties and Covenants.* Seller represents, warrants and covenants as follows:

"* * * * *

"(o) *No Material Change.* Between the date of this Agreement and the Closing Date, there shall have been no material adverse change in the financial condition, assets or business of Seller, and Seller shall not have suffered any material loss by fire or other casualty not substantially covered by insurance.

"* * * * *

"19. *Entire Agreement.* This Agreement constitutes the entire Agreement between the parties hereto. The Agreement terms may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought." (Emphasis in original.)

On February 20, 1981, defendant transferred $25,000 from Northwest's cash account to the Clark trust account for distribution to income beneficiaries, leaving $6,800 in the cash account. The testimony at trial showed that at regular intervals defendant had transferred money to the trust account for distribution, and that on February 20, defendant removed the amount thought to be in excess of what was needed to satisfy defendant's obligations under the prorate clause of the agreement, paragraph 3, *supra.*[1] The parties closed the transaction on February 23, 1981, at which time plaintiff was unaware of the $25,000 transfer.

The sole question presented on appeal is whether the cash account of the business was included in the assets sold by the terms of the contract.[2] At trial, over defendant's objection,

---

[1] The amount owing under the prorate clause was later determined to be $11,344.39, which sum defendant tendered into court.

[2] Special findings of fact were requested pursuant to ORCP 62. The trial court did not make a "finding of fact," as such, on the issue of intent. Under the caption "Discussion," the court stated both that the parties intended to include the cash in the sale and that the cash was an asset of the selling company to be included in the sale. However, in the formal judgment, which included findings of fact, the court

the court admitted testimony about contract negotiations that was offered to show that the parties intended to include the cash in the sale of the business. Although there was no testimony of any discussion about whether to include cash in the transaction, plaintiff's witnesses testified that the parties discussed "what we were purchasing." The evidence showed that at an October 23, 1980, meeting, defendant's trust officer disclosed the existence of cash in the business of $32,000, that defendant submitted a series of monthly statements of financial condition to plaintiff, all of which showed a minimum of $30,000 cash in the business and listed the cash as "current assets," and that on January 17, 1981, plaintiff sent defendant's loan department a letter, to which was attached a financial statement dated January 17, 1981, and entitled "proforma sources and use of funds," showing a projected cash balance "forward" of $55,000.

The parol evidence rule, embodied in ORS 41.740, provides:

> "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

In *Hatley v. Stafford,* 284 Or 523, 531, 588 P2d 603 (1978), the court observed that the parol evidence rule serves an important function:

> "* * * If the parties *in fact* have assented to the writing as the embodiment of their entire agreement, each should be able to rely on the terms of the writing as conclusive evidence of what they have agreed to. * * *" (Emphasis in original.)

---

did not include that statement as a finding. Defendant challenges the sufficiency of the court's findings in its fourth assignment of error. Because we disagree with the court's interpretation of the agreement as a matter of law, we need not reach that question.

■ In the present case, a definitive 14-page contract was prepared by plaintiff's lawyers and signed by the parties after four months of negotiation following the execution of an earnest money agreement. Paragraph 19 of that contract expressly provides that it is the entire agreement between the parties. Plaintiff has not suggested that an agreement to sell cash is something the parties might naturally omit from the writing. *See Caldwell et ux v. Wells,* 228 Or 389, 394-96, 365 P2d 505 (1961). On these facts, we conclude that the terms of the sales agreement were the exclusive embodiment of the intention of the parties and that the trial court erred in considering either the terms of the earnest money agreement[3] or evidence of negotiations.

■ Plaintiff does not deny that the parties' agreement is integrated in the writing, but rather contends that parol evidence was admissible and that the judgment was proper, because the agreement was both patently and latently ambiguous, thus allowing the trial court to find that the agreement entitled plaintiff to cash. Construction of a contract is a question of law. *Timberline Equipment v. St. Paul Fire & Mar. Ins.,* 281 Or 639, 643, 576 P2d 1244 (1978). Determination of whether a contract term is patently ambiguous or, in light of surrounding circumstances, latently ambiguous is also a question for the court. *Timberline Equipment v. St. Paul Fire & Mar. Ins., supra; Ross Bros. Const. v. Trans. Comm.,* 59 Or App 374, 376, 650 P2d 1080 (1982); *Bartlam v. Tikka,* 50 Or App 217, 622 P2d 1133, *rev den* 290 Or 853 (1981). A term is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation. A term is unambiguous if its meaning is so clear as to preclude doubt by a reasonable person. *May v. Chicago Ins. Co.,* 260 Or 285, 490 P2d 150 (1971); *Ross Bros. Const. v. Trans. Comm., supra.*

Plaintiff argues that the agreement is unclear on its face, because the recital that precedes the list of assets to be sold refers to "contracts, leases, rights, goodwill *and assets*" as subjects of the sale, suggesting that the term "assets" refers to items, such as cash, which are not specifically listed. That contention attributes too much significance to the prefatory

---

[3] Normally, if a contract is "subject to" negotiating a later formal agreement, as was the earnest money agreement here, "the formal document is to be the only binding expression of the agreement." 1 Corbin, Contracts 107, § 30 (1963).

recitation generally describing the subject matter of the contract — "the system" — and goes on to state the parties' intent to sell and buy "the system *as provided for in this agreement.*" That recitation is followed by the parties' agreement, paragraph 1 of which identifies with specificity the *"Assets Sold and Purchased,"* which are set forth, with respect to each category of assets, in exhibits A, B and C attached to the agreement. Cash is not listed in any of those exhibits. The contract goes on to provide that the assets purchased "shall be reflected in a Bill of Sale * * * in the form attached" as Exhibit D, which does not list cash. In context, therefore, the word "assets" in the recital does not define specific property being sold; neither does it create an ambiguity.

Plaintiff further contends that paragraphs 5(b) and 6(o), which warrant that there will be no material adverse change in the financial condition, assets or business of the seller before closing, and paragraph 9(a), which contains defendant's promise to operate the system "in the usual and ordinary manner in which it was operated in the past," insure that the buyer will acquire the business, including its bank account, in essentially the same financial condition on the closing date as reflected in the balance sheet attached as Exhibit E. Although the paragraphs mentioned do assure normal operation of the business until the closing, they may not be reasonably construed as describing or as adding to the assets to be purchased under the contract. We believe that plaintiffs' interpretation of those provisions is a strained one in the context of this agreement for the purchase of a sole proprietorship.

Finally, plaintiff contends that the surrounding circumstances demonstrate that the agreement suffers from a latent ambiguity. In support of that contention it points to its January letter to defendant, *qua* bank, enclosing its proforma statement of cash balance forward and to plaintiff's vice president's testimony that he believed cash was included in the purchase. That evidence, if believed, showed only an uncommunicated belief that cash was to be included. Although defendant's representatives admittedly never denied that cash was included in the sale, plaintiff's representatives never asked whether it was. The parties never discussed the issue. "The law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to

their communications and overt acts." *Kitzke v. Turnidge,* 209 Or 563, 572, 307 P2d 522 (1957); *see also Fry v. D.H. Overmyer Co., Inc.,* 269 Or 281, 297, 525 P2d 140 (1974); *Ross Bros. Const. v. Trans. Comm.,* 59 Or App 374, 379, 650 P2d 1080 (1982). Plaintiff's evidence is insufficient to create uncertainty in the mind of a reasonable person as to the meaning of the terms of the agreement.[4]

We hold that the agreement of February 10, 1981, was the final and exclusive embodiment of the intention of the parties, that it is unambiguous and that it does not include the sale of cash. The trial court erred in its interpretation of the contract and in entering judgment for plaintiff.

Reversed.

---

[4] Even if plaintiff's evidence were admissible under ORS 42.220 as evidence of the circumstances under which the agreement was made, there was no discussion of the sale of cash and, therefore, no competent evidence on which the trial court could have relied in interpreting the agreement to include the sale of cash.