Argued and submitted July 30, 1984, reversed in part, remanded for new trial February 27, reconsideration denied May 10, petition for review denied June 25, 1985
(299 Or 314)

## DEERFIELD COMMODITIES, LTD.,
*Appellant - Cross-Respondent,*

*v.*

## NERCO, INC. et al,
*Respondents - Cross-Appellants,*

*v.*

## WELSH et al,
*Third-Party Defendants - Cross-Respondents.*

(A8105-03087; CA A27718)

696 P2d 1096

Robert B. Hopkins, Portland, argued the cause for appellant - cross-respondent and third-party defendants - cross-respondents. With him on the briefs were Richard L. Sadler, Randall L. Dunn, David N. Goulder and Copeland, Landye, Bennett and Wolf, Portland.

Barnes H. Ellis, Portland, argued the cause for respondents - cross-appellants. With him on the briefs were Stephen S. Walters, Charles F. Adams and Stoel, Rives, Boley, Fraser & Wyse, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

Rossman, J., concurring in part; dissenting in part.

### BUTTLER, P. J.

Plaintiff brought this action for damages for breach of contract, material misrepresentation and fraud. Defendants filed counterclaims for breach of contract and fraud, as well as third-party claims based on those theories. After a jury trial, the court entered judgment on a special verdict awarding plaintiff a lump sum of $27,107,000 in damages for breach of contract and material misrepresentation. The jury rejected plaintiff's fraud claim and all of defendants' counter-and third-party claims. Thereafter, defendants filed alternative motions for judgment notwithstanding the verdict or a new trial. Although the court denied the motion for judgment n.o.v., it concluded that the contract between the parties was unambiguous and was limited to a one-year term, and that it had erred in permitting the jury to decide the duration of the contract. Accordingly, it granted a new trial limited to the issue of plaintiff's damages for one year.

On appeal, plaintiff seeks reversal of that order and reinstatement of the judgment. On cross-appeal, defendants seek a retrial of all claims, counterclaims and third-party claims. Because we conclude that the court erred in limiting the new trial to the issue of plaintiff's damages, we reverse and remand for further proceedings not inconsistent with this opinion.

This case involves a contract between plaintiff Deerfield Commodities, Ltd. (Deerfield) and defendant Nerco Coal Sales Company (Nerco), by which Deerfield agreed to supply quantities of anthracite coal silt to Nerco for ultimate sale to certain Korean businesses. Deerfield was organized in the summer of 1980 when its principals learned that Korean companies sought to buy large quantities of coal silt for the production of fuel. During the same period, Nerco, Inc., a large producer of bituminous coal, organized a new Tennessee corporation, Nerco Coal Sales Company,[1] to develop Far Eastern markets for anthracite and bituminous coal.

In November, 1980, Nerco began discussions with both Deerfield and the Korean companies regarding the

---

[1] The parties stipulated that defendant Nerco, Inc., would be responsible for any liability of defendant Nerco Coal Sales Company resulting from this lawsuit. Accordingly, both defendants will hereinafter be referred to collectively as "Nerco."

execution of long term, multi-year contracts for the sale and purchase of coal silt. During negotiations on December 5, 1980, Nerco told Deerfield that it would be responsible for ocean transportation and arrangements with the Koreans. Deerfield stated that it would supply coal silt f.o.b.t. (free on board trimmed), but indicated that moisture specifications outlined in previous Korean contracts were unrealistic and that it would not proceed with specifications requiring less than 12 percent.

On January 19, 1981, after Nerco had obtained two Korean contracts, the parties' representatives met in Chicago and signed a seven-page "Coal Supply Agreement," which provides in "Section III - Term of Agreement":

> "This Agreement shall be effective from the date hereof and shall terminate on December 31, 1981 or upon delivery of 200,000 tons of coal, whichever occurs first, except that the term and quantities may be extended and/or increased pursuant to Section IV and XXI."

Sections IV and XXI provide:

> *"SECTION IV - Purchase and Sale - Quantities*
>
> "Seller shall sell and deliver FOBT and Buyer shall purchase 200,000 tons pursuant to the terms of this Agreement and Exhibit A, provided, however, in the event Dai Han Coal Corporation increases the amount of tons to be delivered pursuant to Exhibit A, Seller shall sell and deliver FOBT such additional tons. Such coal shall be delivered as required to meet the scheduled vessel shipments specified in Exhibit A in a timely manner.
>
> *"SECTION XXI - Option to Extend*
>
> "Buyer shall have the option to extend this Agreement for an additional four years by notifying Seller of its election to exercise said option within thirty days of the termination date hereof or the extended termination date hereof. In such event all terms of this Agreement shall be the same except that (1) the purchase price shall be equal to thirty-one and 55/100 dollars ($31.55) per ton times the percentage increase or decrease in the Gross Nation *[sic]* Product Implicit Price Deflator index from April 1, 1981 to the date of the option exercise, (2) Buyer shall have no obligation to pay all amounts for sales broker or similar fees, and (3) Buyer may increase the annual tons to be delivered up to 500,000 tons."

The agreement also contained an integration clause and a prohibition on oral modification:

"*SECTION XXII - Entire Agreement*

"This document contains the entire agreement between the parties and is entered into by the parties in reliance upon Buyer obtaining a coal contract with Dai Han Coal Corporation of the Republic of Korea. The contract with Dai Han Coal Corporation shall be attached as Exhibit A and the terms thereof shall apply hereto as they relate to Seller. If such contract with Dai Han Coal Corporation is not signed by Janury 15, 1981, this Agreement becomes null and void and shall have no further effect. There are no other understandings, representations or agreements between the parties.

"*SECTION XIII - Nonwaiver, Cumulative Remedies, and Amendments*

"\* \* \* \* \*

"Any and all amendments, supplements and modifications to this Agreement shall be in writing and signed by the parties hereto."

On the same day,[2] the parties executed a single written supplement to the Coal Supply Agreement, entitled "Addedum *[sic]* to Contract No. 1." The addendum was prepared by Nerco's counsel at Deerfield's request and provides, in pertinent part:

"NOTWITHSTANDING anything to the contrary in the above entitled Contract (the 'Deerfield Contract') the parties agree:

"1.   There are two (2) contracts (FKX-DHCC 31-11 and KFX-DHCC 81-14) between HYOSUNG CORPORATION, DAEWONSA COMPANY, LTD., NERCO COAL SALES CO., INTERNATIONAL FUEL CORPORATION, each providing for an initial sale of 200,000 M/tons of product.

"2.   Deerfield Commodities, Ltd. shall be the source of product for both Contracts and all extensions thereof under the terms of the Deerfield contract except as provided herein."

"3.   (a) For Contract KFX-DHCC 81-14 with Hyosung

---

[2] Although the parties appear to have met and signed the "Coal Supply Agreement" and the addendum on January 19, 1981, the former document is dated January 9, 1981. The latter document begins "Addedum *[sic]* to Contract No. 1 Dated January 9, 1981," and specifies no other date.

Corporation the purchase price to Deerfield shall be Thirty and 85/100 Dollars ($30.85).

"(b) Contract KFX-DHCC 81-14 with Hyosung Corporation is hereby attached as Exhibit 'B' and Deerfield shall comply with all obligations therein required by Nerco as the supplier of coal F.O.B.

"* * * * *

"(d) The price in Section XXI, Option to Extend, shall be $30.85 rather than $31.55 for the Hyosung Corporation (KFX-DHCC 81-14) contract."

Both the Dai Han and the Hyosung contracts mentioned in the Coal Supply Agreement and the addendum contain a "quantity" provision stating that the amount purchased is 200,000 metric tons (5 percent more or less at the seller's option), and a one-year schedule showing shipments beginning in March and ending in December, 1981. Those contracts also provide for liquidated damages keyed to the agreed shipping schedule and 200,000 metric tons, and require Nerco to post a performance bond which "shall be released upon instruction of the Buyer after satisfactory completion of the contract or its expiry *[sic]* date, whichever may be sooner." Each Korean contract also has an attachment, providing:

*"LONG TERM*

"1) BUYER SHALL GIVE A PRIORITY TO THE KOREAN SELLER/SUPPLIER WHO HAS PARTICIPATED IN MINE AND/OR SILT OPERATION THROUGH INVESTMENT UNDER THE OVERSEAS NATURAL, *[sic]* RESOURCES DEVELOPMENT PROMOTION LAW OF THE KOREAN GOVERNMENT.

"2) THIS CONTRACT SHALL BE EFFECTED AUTOMATICALLY DURING FIVE YEARS FROM THE DATE OF THIS CONTRACT PROVIDED THAT SELLER PERFORMS THE CONTRACT FAITHFULLY WITHOUT DEFAULT.

"3) THE QUANTITY SHALL BE INCREASED UPON *[sic]* 500,000 M/T PER YEAR BY THE BUYER'S ORDER.

"4) THE PRICE SHALL BE ADJUSTED BY MUTUAL AGREEMENT EVERY YEAR PRIOR TO THE NEXT YEAR'S DELIVERY ON THE FOLLOWING BASIS:

"A) F.O.B. MINE PRICE SHALL BE ESCA-
LATED ON *[sic]* WITHIN (    ) INFLATION RATE
IN U.S.A.

"B) TRANSPORTATION COST, PORT
CHARGE AND ETC. SHALL BE REFLECTED ON
*[sic]* ACTUAL COST COVERING THE DELIVERY
YEAR.

"5) OCEAN FREIGHT SHALL BE ADJUSTED BY
MUTUAL AGREEMENT."

Deerfield presented testimony at trial that one of the principal
purposes of the addendum to the Coal Supply Agreement was
to clarify that "Nerco was bound to Deerfield for the full five
years of the Korean contracts."

The "Coal Supply Agreement" also provides:

*"SECTION V - Quality*

"(A)   Coal Specification - The quality of all coal delivered
to Buyer hereunder shall be such that it meets all of the
specifications of Exhibit A. Seller shall use its best efforts to
provide coal that will not be subject to penalties as described
in Exhibit A, such penalties to be Seller's responsibility."[3]

Notwithstanding that both Korean contracts specified 7 per-
cent moisture as the beginning point for penalties, Nerco
allegedly assured Deerfield that the beginning point agreed
upon by the Koreans and applicable to the contract was in fact
12 percent. Moisture readings from 7 percent to 12 percent

---

[3] Exhibit A, the Dai Han contract, provides, in pertinent part:

"4. *Specification*

|  |  | (Rejection Point) |  |
|---|---|---|---|
| "1) Total Moisture: | 7% Max. | 15% | (as received basis) |
| "2) Sulphur | 1% Max. | 1.3% | (air dry basis) |
| "3) Volatile Matter: | 10% Max. | 12% | (    "    ) |
| "4) Caloric Value: | 5,500 Kcal/Kg.Min. | (    "    ) |
| "5) Size: | 0 - 25 m/m |  |  |

"5. *Penalty (pro-rata)*

"i) Total Moisture:

"a) In case exceeding 7%, for each 1% of excess to be deducted 1% of CIF
value per M/T up to 12%

"b) In case exceeding 12%, for each 1% of excess over 12% to be deducted
2% of CIF value per M/T up to 15%."

would thus actually qualify as 7 percent (7 to 12 is 7 percent), and readings between 12 percent and 15 percent would qualify as 12 percent (12 to 15 is 12 percent). Nerco allegedly explained that the specifications as written in Korean government contract forms could not be changed, but that performance tolerances were such that the alternative figures would govern.

Regarding financing of the transaction, the addendum provides:

> "5.  For the first two (2) ships of each of the said two (2) contracts, NERCO COAL SALES CO. shall provide to the mine supplier and truckers pursuant to Deerfield Commodities, Ltd.'s contract with said mine supplier and truckers, the required form of funding and guarantees, specifically four (4) Letters of Credit; one subsequent to the other, each in the sum of $275,000 to be provided at the bank of Deerfield · Commodities and KEON Coal Co., Inc. Such Letter of Credit shall be provided when NERCO receives acceptable nomination of vessel to carry the coal to be provided by Deerfield."

The trial court admitted evidence that, during early negotiations, Nerco proposed to pay 70 percent of the price on delivery of the silt at the mine sites and 30 percent after the ships were loaded, but later preferred to provide a $500,000 line of credit and to pay the balance owed on receipt of payment from the Koreans. At the time that the contracts were signed, however, Nerco allegedly agreed to provide *all* necessary financing for the first four ships, with balances owed Deerfield payable on receipt of payment from the Koreans.

Following execution of the contract on January 19, Deerfield and Nerco executed a five-year contract with the stevedores, M.J. Rudolph Company. Additionally, Deerfield secured supplies, bulldozers and loaders, hired personnel and purchased, modified and tested a $75,000 aggregate dryer for silt. Nerco did not secure a shipping contract, however, until March 6, 1981. Deerfield's evidence at trial showed that, given the contract prices previously negotiated with the Koreans and Deerfield, actual shipping costs reduced Nerco's projected profits to a minimum.

In early March, Nerco wrote to Deerfield, expressing concern about, and demanding assurances of, its ability to

perform and threatening to take over its contracts with suppliers, truckers and stevedores. On receipt of that letter, Deerfield inquired about the motivation behind it and objected to what it considered unreasonable demands for assurances. Although Nerco allegedly induced Deerfield to reveal its sources by promising not to contact them, by April 1 Nerco had contacted and arranged for Deerfield's truckers and stevedores to work directly for it.

By March 27, Deerfield had trucked over 31,000 tons of silt to dockside, although the first ship, Fidias, did not arrive until April 11. The moisture content of the first shipment, as confirmed by Nerco's testing, was 11.79 percent. On the basis of those test results, also submitted by Nerco to the Koreans for payment, Deerfield billed Nerco for amounts owed.[4] Nerco refused to pay, claiming, allegedly for the first time, that the applicable moisture specification was 7 percent and that the $110,998 penalty imposed by the Koreans eliminated any sums owed to Deerfield. Deerfield objected to the enforcement of the 7 percent penalty provision,[5] because it understood that no penalties would be incurred unless the moisture content exceeded 12 percent. It contended that the imposition of penalties only at levels exceeding 12 percent was discussed as late as April 8 during a meeting at which Korean representatives were present.

After the first shipment, 12,000 tons of coal silt remained at portside until the arrival of the second ship, Orient Union, on May 1. Moisture readings on the second shipment were 18.26 percent, with the excess over 12 percent allegedly attributable to rainfall during the delay in the arrival of the ship. A moisture penalty of $152,152.35 was assessed by the Koreans with respect to that shipment.

Deerfield refused to pay the penalties imposed by the Koreans for the two shipments. Nerco, in turn, refused to pay Deerfield for either shipment and terminated the contract between the parties. After the departure of the Orient Union,

---

[4] Nerco's form of letter of credit submitted to the Koreans for payment of the first shipment indicated that there would be no penalties for any moisture under 12 percent.

[5] Although evidence at trial showed that Nerco objected to the enforcement of the moisture penalty provisions by the Koreans, it decided ultimately not to contest the issue in arbitration under the terms of the Korean contract.

Nerco sold ten more shipments of silt to the Koreans in 1981 for a sales price of $23,000,000. Deerfield then commenced this action. At the close of the 1981 year, the Korean purchasers released Nerco's performance bonds and rejected Nerco's coal silt bids in 1982 and also in 1983. Nerco presented evidence at trial that there was no Korean market for coal silt in 1983.

Before turning to the parties' assignments of error, it is necessary to summarize the bases of Deerfield's claims and of Nerco's counterclaims and third-party claims, so that we may determine whether a new trial is proper and, if so, which, if any, of those claims must be retried.[6] In its first claim for relief, Deerfield alleged that Nerco breached the parties' contract in that it failed: (1) to provide the required form of funding and guarantees, (2) to pay monies owed for the two shipments delivered, (3) to pay for additional coal supplied by Deerfield and (4) to perform in good faith (listing various instances). For those breaches, it sought damages of $38,000,000 in lost profits. In its second claim for relief, Deerfield reiterated the claim for damages sought in its first claim, alleging that Nerco defrauded it by falsely representing that: (1) coal supplied Nerco having moisture content at levels in excess of those specified under the written contract would be acceptable, (2) Nerco would promptly provide all necessary funding and guarantees to purchase, transport and load coal on the first four ships, (3) Nerco would provide timely and accurate notice of the arrival times of ships to enable Deerfield to schedule delivery of coal with minimum moisture levels and (4) Nerco would timely communicate and cooperate with Deerfield concerning performance of all aspects of the Coal Supply Agreement. In addition to lost profits, Deerfield sought punitive damages of $75,000,000 for fraud. In its third claim for relief, Deerfield sought $38,000,000 in damages for

---

[6] At the outset, we reject third party defendants' contention that Nerco waived any appeal from the jury verdict on its cross-claims and counterclaims, because none of its assignments or discussions relating thereto concern those claims. Although it is true that none of Nerco's assignments mentions its counterclaims or cross-claims, the errors claimed affected the resolution, not only of Deerfield's claims, but also of Nerco's counterclaims and cross-claims for breach of contract. However, because the jury found against Nerco on its fraud claims against Deerfield and third-party defendants and because no error is assigned relating to those claims, they are not before us.

material misrepresentations based on the allegations set forth in the second claim for relief.[7]

In its first "affirmative defense and counterclaim," Nerco alleged that Deerfield breached the parties' contract by (1) failing to deliver coal which met the written moisture and calorific specifications, (2) failing to deliver coal f.o.b.t. until Nerco paid for services and facilities, (3) causing Nerco to advance funds not required by the contract, (4) failing to reimburse Nerco for penalties, (5) failing to complete assignment of coal leases and contracts to enable Nerco to secure performance and (6) failing to perform in good faith (listing various instances). For those breaches, Nerco claimed to have been damaged in that it was assessed penalties of $2,500,000 for Deerfield's failure to deliver coal meeting specifications and incurred expenses of $9,000,000 in obtaining coal, trucking and other services, which were Deerfield's responsibility under the contract. It also alleged that Deerfield was liable for any damages that Nerco would be unable to mitigate.

In its "second affirmative defense and counterclaim," Nerco alleged that Deerfield defrauded it by falsely representing that it had coal leases sufficient to enable it to deliver 200,000 tons of coal silt before December 31, 1981, that the silt delivered would meet contract specifications and that it had the financial ability to obtain and deliver coal f.o.b.t. It sought the relief requested in its first "affirmative defense and counterclaim," plus $1,000,000 in punitive damages. In its third "affirmative defense and counterclaim," Nerco sought damages of $60,000 and punitive damages of $100,000, alleging that Deerfield defrauded it by falsely representing that it was required to purchase high quality coal from Colleen Coal Company in order to meet contract specifications, that the company was controlled by judges and politicians in Pennsylvania, that the price of coal was $42.70 per metric ton and that Nerco had to post a letter of credit to Colleen Coal Company to consummate the sale.

---

[7] Although the amended complaint does not specifically so state, Deerfield's trial memoranda, requested instructions and brief on appeal state that its claim for material misrepresentation was based on the theory that a false representation of a material fact, although innocently made, may be the ground for recovery of damages. *See Lanners v. Whitney,* 247 Or 223, 428 P2d 398 (1967).

The gist of Nerco's third-party complaint is that such a unity of ownership existed between Deerfield and third-party defendants that third-party defendants should be held liable for Deerfield's breach of contract and fraud. It also alleged that Deerfield and third-party defendants entered into a conspiracy to defraud Nerco, for which Nerco was entitled to recover the damages sought in its first and third "affirmative defenses and counterclaims" and $5,000,000 in punitive damages.

The assignments of error on both the appeal and the cross-appeal are concerned primarily with interpretation of the written agreement between the parties and the trial court's admission of evidence of what the parties intended. The parties dispute the interpretation of the contract provisions relating to its duration, applicable moisture content specifications and financing.

■   At the outset, we note that the Coal Supply Agreement provides that Pennsylvania law governs its interpretation. If, however, there is no apparent conflict between the relevant principles of Pennsylvania and Oregon law, we are free to apply the latter. *See, e.g., W.L. May Co. v. Philco-Ford Corp.,* 273 Or 701, 705 n 1, 543 P2d 283 (1975); *Erwin v. Thomas,* 264 Or 454, 457-58, 506 P2d 494 (1973). In this opinion, we rely on Pennsylvania law only when it appears that that law may be different from the Oregon law or when there appears to be no applicable Oregon law.

Deerfield's only assignment is that the trial court erred in concluding after judgment that the contract was unambiguously limited to a one-year term. It contends that the relevant provisions may be construed as providing for either a one-year or a five-year term[8] and that the issue of their construction was properly submitted to the jury.[9]

---

[8] Deerfield does not contend that the agreement may be interpreted *unambiguously* as a five-year contract. Neither does it contend that it may be interpreted as being a contract for more than one year but less than five years.

[9] The trial court instructed the jury as follows:

"* * * Where that contract involves repeated occasions for performance by either or both parties, where the terms of a written contract are ambiguous or conflicting, or their meaning is doubtful or obscured, you should determine what the parties intended those terms to mean.

"In resolving such an ambiguity, if any, you may consider the surrounding

Accordingly, it seeks reinstatement of the judgment based on the verdict in its favor.

As a general rule, the construction of a contract is a question of law. If the court determines that language of a contract is ambiguous, evidence may be admitted relating to the intention of the parties, and that question becomes one of fact. *Timberline Equip. v. St. Paul Fire & Mar. Ins.,* 281 Or 639, 643, 576 P2d 1244 (1978). A contract provision is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation; it is unambiguous if its meaning is so clear as to preclude doubt by a reasonable person. *May v. Chicago Insurance Co.,* 260 Or 285, 490 P2d 150 (1971); *Oakridge Cablevision v. First Interstate Bank,* 65 Or App 640, 673 P2d 532 (1983). In determining whether a contract is ambiguous, parol evidence is admissible to explain the circumstances under which it was made. Although the evidence may not vary the terms of the written agreement, it can place the judge "in the position of those whose language is being interpreted." ORS 42.220; *Welch v. U.S. Bancorp,* 286 Or 673, 690-92, 596 P2d 947 (1979); *Card v. Stirnweis,* 232 Or 123, 128-31, 374 P2d 472 (1962); *Taylors Coffee Shop v. Taylor,* 56 Or App 419, 643 P2d 347, *rev den* 293 Or 235 (1982).

Deerfield contends that the language of the addendum specifying that Deerfield "shall be the source of product" for both Korean contracts can be read to imply that the five-year provision of those contracts governed the duration of the relationship between it and Nerco. It contends that the following circumstances surrounding and subsequent to the execution of the contract support that interpretation: (1) pre-contractual negotiations evidencing that all participants sought a long-term commitment; (2) Nerco's representation that a five-year commitment had been secured from the Koreans; (3) Deerfield's request that the addendum be drafted specifically to insure that Nerco was bound to it for the full

---

circumstances, the situation of the parties, the objects that they had in mind, [and] the nature of the subject matter of the contract to ascertain the intention of the parties."

It appears that the court left it to the jury to determine whether the contract was ambiguous.

term of the Korean contracts, and (4) the parties' execution of a five-year stevedoring contract with M.J. Rudolph Company.

Nerco, on the other hand, contends that the language on which Deerfield relies, *taken in context,* unambiguously provides that the parties were bound for only a one-year term, and argues that its interpretation is supported by the fact that the Korean buyers discontinued dealings with Nerco after the first year and released Nerco's performance bond in accordance with the contractual provisions that the bond be released "after satisfactory completion of the contract or its expiry date."[10] We agree with the trial court's ultimate ruling that Nerco's interpretation is the correct one.

Deerfield isolates one phrase of the addendum to support its argument that the contract is ambiguous on the question of duration. However, an examination of the entire contract and addendum negates that contention. The relevant provision, taken in context, provides:

"NOTWITHSTANDING anything to the contrary in the above entitled Contract (the 'Deerfield Contract') the parties agree:

"1.  There are two (2) contracts (FKX-DHCC 31-11 and KFX-DHCC 81-14) between HYOSUNG CORPORATION, DAEQONSA COMPANY, LTD., NERCO COAL SALES CO., INTERNATIONAL FUEL CORPORATION, each providing for an initial sale of 200,000 M/tons of product.

"2.  Deerfield Commodities, Ltd. *shall be the source of product for both Contracts and all extensions thereof under the terms of the Deerfield contract except as provided herein.*" (Emphasis supplied.)

Those provisions can be read only as providing that two Korean contracts existed, that Deerfield would be the source of silt for *both* contracts (a clarification of the Coal Supply Agreement's mention of only the Dai Han contract) and that it would supply silt for any extensions granted *under the terms of the Coal Supply Agreement.* The recitation in

---

[10] Deerfield attempted to prove at trial that the Koreans discontinued dealings with Nerco because of the latter's consistent failure to perform according to specifications. Under the terms of the Korean contracts, however, in the event that Nerco failed to "make deliveries of the coal within the time specified to perform faithfully and contractual conditions [sic]," the Koreans could unilaterally rescind the contract and require forfeiture of Nerco's performance bond, which they did not do.

paragraph 3(b) of the addendum, that "the price in Section XXI, Option to Extend shall be $30.85 rather than $31.55" is the only modification of the terms of the Coal Supply Agreement to which the phrase in paragraph 2, "except as provided herein" can relate. In determining the meaning of the contract, we are required to consider the instrument as a whole rather than its isolated clauses. *Sproul et al v. Gilbert et al,* 226 Or 392, 402, 359 P2d 543 (1961); *State ex rel Bakke v. Bakke,* 30 Or App 345, 567 P2d 126 (1977). Because both of the references in the addendum to the four-year option to extend would be superfluous if the parties had intended to be bound for a five-year period, the only reasonable interpretation of the emphasized provision is that they did not intend to be so bound.

Neither were the "LONG TERM" clauses of the Korean contracts specifically incorporated by reference into the parties' agreement. Although the integration clause of the Coal Supply Agreement provides that the terms of the Dai Han contract would "apply hereto as they relate to seller (Deerfield)," that general language cannot be construed to override or conflict with the more specific provision of the agreement relating to the duration of the parties' commitment. *See A-1 Sandblasting v. Baiden,* 53 Or App 890, 894, 632 P2d 1377 (1981), *aff'd* 293 Or 17, 643 P2d 1260 (1982). The addendum simply provides that, as to the Hyosung contract, "Deerfield shall comply with all obligations therein required by Nerco as supplier of coal F.O.B." The parties are sophisticated corporations (*i.e.,* merchants, *see* ORS 72.1040(1)) and were represented by counsel in negotiating the terms of their agreement.[11] If they had intended that the "LONG TERM" clauses of the Korean contracts would govern their relationship, or that the agreement between them was for five years, they could have expressly so provided. The fact that they did neither indicates that section XXI of the contract means exactly what it says: the contract was for one year with the buyer having an option to extend it for an additional four years.

Indeed, even if the "LONG TERM" clauses of the Korean contracts had been incorporated by reference, they do

---

[11] In fact, Deerfield's principal, William O'Hare, is a lawyer and was present throughout the negotiations.

not support Deerfield's construction of the contract. Although the circumstances surrounding the execution of the Deerfield contract suggest that the parties may have anticipated a long-term relationship with the Korean buyers, the terms of the Korean contracts belie a firm five-year commitment. Each Korean contract states that the amount purchased is 200,000 metric tons, sets forth a schedule of shipments beginning in March and ending in December, 1981, and provides for liquidated damages keyed to a one-year schedule. The "LONG TERM" clauses expressly state that the buyers shall give "A PRIORITY TO THE KOREAN SELLER/SUPPLIER WHO HAS PARTICIPATED IN MINE AND/OR SILT OPERATION THROUGH INVESTMENT UNDER THE OVERSEAS NATURAL, RESOURCES DEVELOPMENT PROMOTION LAW OF THE KOREAN GOVERNMENT." There is no evidence that Nerco was such a participant and thus would be given priority.

Although the contract was to be "effected automatically" during five years from its date, the quantity of coal silt was to be "increased upon [sic] 500,000 M/T per year by the buyer's order." Price was to be adjusted each year by "mutual agreement." The applicable inflation rate for adjusting the f.o.b. mine price was simply left blank. Ocean freight, which Deerfield argued was a supply cost factor subject to considerable risk, was also to be adjusted by mutual agreement. The brief course of dealing between Nerco and the Korean buyers further suggests that both viewed their relationship as tentative after the first year. Moreover, even the stevedoring contract,[12] the execution of which Deerfield contends indicates the parties' five-year commitment, states that Nerco agreed to provide a *minimum* of 400,000 tons of silt for loading on the vessels over a five-year period. Because 400,000 tons of silt equalled the total amount Nerco agreed to deliver during the first year under both Korean contracts, the execution of the stevedoring contract is not inconsistent with the parties'

---

[12] Nerco presented evidence at trial showing that, after the execution of the stevedoring contract, it immediately notified M.J. Rudolph Co. that its agent lacked authority to enter a five-year contract or any other "terminalling" contract for Nerco. It also reprimanded the agent for his unauthorized act. The "terminalling" agreement ultimately entered into between Rudolph and Nerco provided for a one-year term with an option to extend it for four years. The option was never exercised.

understanding that they had a one-year commitment, with the possibility of a four-year extension.

In short, even reading the language of the addendum to mean that the Korean contracts were incorporated in their entirety in the parties' agreement, the Deerfield contract was not a five-year contract, because the Korean contracts were not. Having concluded that the contract was for one year, the trial court properly granted Nerco's motion for a new trial.

We turn now to the question of whether the court erred in limiting the new trial solely to the issue of Deerfield's damages for a one-year period. Nerco assigns 29 errors on cross-appeal, contending that the trial court's admission of extrinsic evidence and its instructions to the jury regarding the construction of the parties' contract entitles it to an entirely new trial on whether it breached the one-year contract and whether it is liable for misrepresentation, and also on its counterclaims and third-party claims. It groups its assignments respecting the court's rulings into three general subject areas: (1) applicable moisture penalty specifications, (2) Nerco's financing obligations and (3) Deerfield's theory of damages. We consider them accordingly.

Nerco's first 12 assignments concern the trial court's rulings with respect to the applicable moisture penalty specifications of the parties' agreement. Its first assignment, however, is a blanket assertion that the trial court erred in admitting evidence of alleged oral agreements contradicting *any* of the written contract provisions in violation of the parol evidence rule, ORS 72.2020, which provides:

> "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> "(1)   By course of dealing or usage of trade as provided in ORS 71.2050 or by course of performance as provided in ORS 72.2080; and
>
> "(2)   By evidence of consistent additional terms unless the court finds the writing to have been intended also as a

complete and exclusive statement of the terms of the agreement."

The initial question is whether the Coal Supply Agreement and the addendum thereto were intended by the parties as the final expression of their agreement and, if so, whether they were also intended as the parties' complete and exclusive statement of their agreement. Deerfield contends that any relevant evidence is admissible to determine whether the agreement was a complete integration and that the parties' discussions regarding moisture penalties and financing clearly evidence that it was not. Notwithstanding that evidence, the Coal Supply Agreement contains an integration clause and a separate clause expressly providing that "any and all amendments, supplements and modifications to this agreement shall be in writing." The addendum, executed the same day as the Coal Supply Agreement, was the only written modification of that agreement and was prepared after all of the alleged statements that are inconsistent with the written contract were made. The agreement, therefore, was the final one between the parties.

■ The language of the integration clause is that "this document contains the *entire* agreement between the parties." (Emphasis supplied.) That provision was not modified by the addendum. Although the UCC is silent on the matter, in a noncommercial context, at least one court, applying Pennsylvania law, has held that such a provision creates a *conclusive* presumption that the agreement is fully integrated. *See United States Gypsum Co. v. Schiavo Bros., Inc.,* 450 F Supp 1291, 1302 (ED Pa 1978), *new trial granted* 485 F Supp 46 (ED Pa 1979), *aff'd in part, rev'd in part* 668 F2d 172 (3d Cir 1981), *cert den* 456 US 961 (1982). We conclude that the parties meant what they expressly provided in the integration and oral modification clauses. The agreement was fully integrated.

Although the relevant provisions of the Korean contracts clearly provide for the imposition of penalties at moisture levels exceeding 7 and 12 percent and were incorporated in the contract by reference, Deerfield contends that the trial court properly admitted evidence of an oral understanding that penalties would begin at 12 and 15 percent rather than 7 and 12 percent under any one of several "exceptions" to the parol evidence rule. First, it maintains that that rule is

inapplicable, because Nerco "admitted" at trial that there was an oral agreement between the parties. Even assuming that the evidence relied on by Deerfield amounted to an admission, Deerfield misperceives the scope of the admission exception. In *DeVore v. Weyerhaeuser Co.,* 265 Or 388, 403, 508 P2d 220 (1973), *cert den* 415 US 913 (1974), the court stated:

> " "* * * The oral admissions of the plaintiff that the agreement included matters not *contained in the writing* may be proved to show that it was not assented to as a complete integration, however complete it may look on its face. * * *" " Quoting 3 Corbin, Contracts 451, § 582 (1960). (Emphasis supplied.)

Stated somewhat differently by the court in *Yuhas v. Schmidt,* 434 Pa 447, 258 A2d 616, 621 (1969), the rule is that:

> " 'Where a party . . . seeking to have a written agreement enforced according to its terms, *admits* in his own trial testimony that the agreement in writing did not *fully* and *completely* state the entire agreement between the parties, then parol evidence is admissible to explain and supplement such written agreement.' * * *" (Emphasis in original; citations omitted.)

As we understand the exception, when a party admits to an oral agreement that is not inconsistent with the writing, the written agreement may not represent the "complete and exclusive" statement of the parties. Under ORS 72.2020(2), *consistent additional terms* may then be admitted. Without a showing that the writing executed by the parties was not intended as their *final* expression, however, evidence *contradicting* the terms of the writing may not be introduced under the exception. Any other construction of that exception would be inconsistent with the court's ruling in *Hatley v. Stafford,* 284 Or 523, 588 P2d 603 (1978), that the admission of parol evidence in cases involving the partial integration doctrine is limited by the requirement that the oral agreement be consistent with the written agreement and be made for separate consideration or be such as might naturally be made as a separate agreement by the parties. Because we have concluded that the agreement between the parties was fully integrated, the evidence introduced at trial was inadmissible under the so-called admission exception, because it contradicted the terms of the writing.

Deerfield's next contention is that evidence showing that 7 meant 12 and 12 meant 15 was admissible under the guise of "interpretation." It contends that when the parties adopt a special meaning or application for particular terms of their agreement, even

> "* * * ordinary English words can be deprived of their ordinary meanings and supplied with others — even with meanings that are the exact opposite of their ordinary ones. White can be made to mean black, five can be made to mean ten, 500 feet can be made to mean 100 inches, and Bunker Hill Monument can be made to signify Old South Church." Quoting 3 Corbin, Contracts 155, § 544 (1960).

Although the drafters of the Uniform Commercial Code apparently recognized the distinction between "interpretation" (what the parties intended) and "construction" (whether the contract is ambiguous) espoused by the treatise writers, the final code provisions adopted limit the means whereby evidence of interpretation can be admitted.

■■ ■■ UCC 2-202, codified in ORS 72.2020, provides that the terms of a completely integrated document may be *explained* or *supplemented* by three different means: specifically, evidence of (1) a course of dealing, (2) a course of performance or (3) usage of the trade. Official *comment c* to UCC 2-202 expressly rejects the requirement that a condition precedent to the admissibility of that type of evidence is a determination by the court that the language used is ambiguous. ORS 72.2080(2) provides:

> "The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade."[13]

Reading the relevant statutory provisions with the commentary, we conclude that, although an integrated document need

---

[13] ORS 71.2050(4) contains a similar provision:

"The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

not be ambiguous before it may be supplemented or explained by evidence of the type mentioned above, the document must, nonetheless, be reasonably susceptible to the interpretation suggested by the course of dealing, course of performance or usage of the trade before that evidence is admissible. ORS 72.2020 compels the same result by prohibiting evidence that *contradicts* the terms of an integrated agreement. Because the admission of Deerfield's evidence that 7 meant 12 and 12 meant 15 contradicted the clear provisions of the agreement, it was inadmissible for the purposes of showing a course of performance, course of dealing or trade usage. The trial court erred in admitting that evidence in support of Deerfield's breach of contract claim. The question remains whether it properly admitted that evidence in support of Deerfield's claim for material misrepresentation or fraud.

■■■ Nerco contends that Deerfield's evidence of alternative moisture penalty specifications is inadmissible under the fraud or material misrepresentation exception[14] to the parol evidence rule, because Pennsylvania courts have limited the applicability of that exception to cases in which the alleged misrepresentations do not conflict with the written contractual provisions.[15] For that proposition, it relies principally on

---

[14] The exception is generally stated as follows:

"The parol evidence rule does not become applicable unless * * * the parties have assented to a writing or writings as the statement of the agreement or contract between them.

"Accordingly, it may be shown by parol evidence not only that a writing was never executed or delivered as a contract, but also that the validity of the agreement was impaired by *fraud, illegality, duress, mistake, lack of or failure of consideration* rendering the agreement voidable or void." 4 Williston, Contracts 1017, § 634 (1961). (Emphasis supplied.)

*Accord* 3 Corbin, Contracts 431, § 580 (1960).

Some commentators have suggested that the so-called "fraud" exception should not be used to admit evidence when the court concludes that a misrepresentation is wholly innocent. *See* White & Summers, *Uniform Commercial Code*, §§ 2-11 (1980). However, Pennsylvania courts appear to consider material misrepresentation as a species of fraud to which the exception applies. *See Berger v. Pittsburgh Auto Equip. Co.*, 387 Pa 61, 127 A2d 334, 335 (1956); *Glanski v. Ervine*, 269 Pa Super 182, 409 A2d 425, 430 (1979).

[15] Contrary to Deerfield's contention, Nerco did not waive the right to contest the admission of the evidence on the contract claim by failing to request an instruction limiting that evidence to the fraud and material misrepresentation claims. Our examination of Nerco's assignments, *infra*, convinces us that its motion for a directed verdict was improperly denied at least as to Deerfield's specification that Nerco "failed

the Pennsylvania Superior Court's decision in *LeDonne v. Kessler,* 256 Pa Super 280, 389 A2d 1123 (1978).

In *LeDonne,* purchasers of a home alleged that they signed an agreement in reliance on the vendors' fraudulent representation that a sundeck and cellar did not leak water, and that a drainage problem in the septic system had been repaired. The agreement contained this provision: "[T]he parties have full knowledge of the physical appearance of the land and buildings and of the value thereof and there are no verbal representations as to character or quality." Because the purchasers' visual inspection of the property prior to the execution of the agreement revealed evidence of leakage in the sundeck and cellar, the court concluded that they were not entitled to present evidence of the alleged representations, stating:

> "At the time of executing the agreement of sale, appellants had every reason to insist upon contractual protection against this readily discernible threat. Indeed, even accepting their allegation that these assurances induced them to enter the contract, appellants were particularly imprudent not to insist upon written contractual protection. Instead, appellants signed an agreement in which they explicitly waived their right to rely upon any oral representations they may have received concerning the condition or quality of the physical premises.

> "* * * If we seriously desire to preserve the integrity of written contracts, * * * then we must insist upon the application of the parol evidence rule when a party knows about the evidence of substantial problems, yet contractually stipulates that he has received no promises about these problems. Rather [than] * * * allow circumvention of the substantive policies of the parol evidence rule by pleading niceties, we should balance the extent of the party's knowledge of objectionable conditions derived from a reasonable inspection against the extent of the coverage of the contract's integration clause in order to determine whether that party could justifiably rely upon oral representations without insisting upon further contractual protection or the deletion of an overly

to provide the necessary form of funding and guarantees." Because the jury improperly considered that specification in returning a verdict on the *entire* contract claim, Nerco is entitled to a retrial of that claim, regardless of its failure to request a limiting instruction.

broad integration clause." 389 A2d at 1130. (Citations omitted.)

Because the purchasers could not discern the existence of the septic system problem through visual inspection alone, however, the court concluded that the contract did not bar the admission of the vendors' alleged representations regarding that problem.

The Pennsylvania Superior Court's more recent decision in *Abel v. Miller,* 293 Pa Super 6, 437 A2d 963 (1981), indicates that the rule formulated in *LeDonne* is not limited to cases involving the inspection of property. In *Abel,* the parties entered into an agreement for the sale of real estate. Pursuant to that agreement, the purchasers gave the vendors a non-negotiable note in the amount of $6,000, payable at the time of settlement or as liquidated damages in the event of the purchasers' default. After the purchasers defaulted, the seller sought arbitration and was awarded $6,000, plus interest. The purchasers appealed to the court and, in response to the vendors' motion for summary judgment, moved to amend their answer to assert a new defense. The motion was denied, and the purchasers appealed to the Superior Court, contending that they were entitled to amend their answer to allege that they had been fraudulently induced to enter into an agreement by the vendors' representation that they could assume a promissory note which the vendors had given their predecessor in interest. The agreement, however, specifically provided:

"This Agreement, and BUYER'S obligation to make settlement —

"(a) are NOT CONTINGENT upon BUYER'S obtaining financing of any kind or receiving settlement for any other real estate." 437 A2d at 964.

Relying on *LeDonne,* the court held that, because the written agreement *specifically contradicted* the representation on which the purchasers sought to rely in their new defense, the lower court properly prohibited the amendment to their answer.

Here, the alleged representations regarding moisture penalties *specifically contradict* both the penalty provisions incorporated in the parties' agreement and the provision that

"there are no other understandings, representations or agreements between the parties." If Deerfield had intended to rely on oral representations that 7 meant 12 and 12 meant 15, it should have incorporated that agreement in its contract, notwithstanding the express provisions of the Korean contracts to the contrary. It was not necessary to amend the Korean contracts in order for Deerfield and Nerco to agree on when, as between those parties, the moisture penalties would be applicable. Because Deerfield signed the contract directly conflicting with the alleged oral agreement and providing that there were no other agreements or representations, it cannot rely on the "fraud or material misrepresentation" exception to the parol evidence rule, at least under Pennsylvania law. Therefore, its claim for material misrepresentation must be retried; other issues relating to damages on that claim are discussed later in this opinion.

■ Nerco's assignments of error thirteen through nineteen relate to the trial court's construction of the financing provision of the addendum, which, to reiterate, provides:

> "5. For the first two (2) ships of each of the said two (2) contracts, NERCO COAL SALES CO. shall provide to the mine supplier and truckers pursuant to Deerfield Commodities, Ltd.'s contract with said mine supplier and truckers, the required form of funding and guarantees, specifically four (4) Letters of Credit; one subsequent to the other, each in the sum of $275,000 to be provided at the bank of Deerfield Commodities and KEON Coal Co., Inc. Such Letter of Credit shall be provided when NERCO receives acceptable nomination of vessel to carry the coal to be provided by Deerfield."

Nerco contends that the trial court erred in allowing the jury to consider evidence that Nerco agreed to provide unlimited advance funding for all four ships, because that evidence contradicts the express terms of the financing provision. Deerfield contends that the provision is ambiguous. It argues that the language specifying that Nerco shall provide "the required form of funding and guarantees" is susceptible to an interpretation that Nerco's obligation was not limited to providing letters of credit in the amount specified and that, because there was no single contract with a mine supplier and truckers, no single letter of credit would satisfy that obligation.

We hold that the language, taken in context, is not

susceptible to the interpretation advanced by Deerfield. The phrase "the required form of funding and guarantees" is modified by the word "specifically," which means that what follows is a delineation of the scope of the obligation. That there was more than one contract with truckers and suppliers would not change the extent of the specific obligation Nerco undertook to perform. Insofar as Deerfield is attempting to present evidence of consistent additional terms, it is precluded from doing so by ORS 72.2020(2), given our holding that the written agreement and addendum represent the parties' complete and exclusive statement on the matter.

Although Deerfield is correct in contending that Nerco's conduct subsequent to the execution of the addendum qualifies as a "course of performance" admissible to determine the meaning of the agreement under ORS 72.2080,[16] that Nerco provided guarantees for stevedoring, financing for coal sweetener, and so forth, cannot change the fact that the written agreement did not require those things. Neither can that conduct be construed as a *waiver* of any term of the writing under ORS 72.2080(3), as Deerfield contends. Nerco did not have an obligation to provide additional financial assistance; by so doing, it neither increased nor contravened its contractual obligation.

We have concluded that the trial court did not err in holding that the agreement was limited to one year, but that it erred in construing the contract provisions relating to moisture penalties and financial assistance and in admitting evidence that we have concluded should not have been admitted. Because the court submitted multiple contract claims and

---

[16] ORS 72.2080 provides:

"(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

"(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade.

"(3) Subject to the provisions of ORS 72.2090 on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

two claims for material misrepresentation to the jury, it is not possible to determine from the verdict form on which claims the verdicts are based;[17] therefore, all of the issues involved in plaintiff's breach of contract and misrepresentation claims and in defendant's counterclaim and third-party claims for breach of contract must be retried.

One of the remaining assignments of error raises a question that is likely to arise on retrial of Deerfield's misrepresentation claim; accordingly, we address it. Nerco contends that Deerfield is not entitled to lost profits for material misrepresentation, because recovery under that tort theory traditionally has been limited to "the difference between the value of what the [injured party] has parted with and the value of what he has received in the transaction." Restatement (Second) Torts, § 552C (1977). As Deerfield points out, however, UCC § 2-721, codified in ORS 72.7210, provides:

> "Remedies for material misrepresentation or fraud include all remedies available under ORS 72.1010 to 71.7250 for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy."

The official comment to UCC § 2-721 states that "the remedies for fraud are extended by this section to coincide in scope with those for non-fraudulent breach."

Nerco argues that, notwithstanding the apparent statutory abrogation of the common law limitation, Oregon case law suggests that lost profits are not available in this case, citing *Melms v. Mitchell,* 266 Or 208, 512 P2d 1336 (1973), and *Lanners v. Whitney,* 247 Or 223, 428 P2d 398 (1967). Those authorities do not support Nerco's contention. Whether lost profits *should* be recoverable for material misrepresentation is a question for the legislature.

We need not consider assignments of error 25 through 28, in which Nerco contends that there was insufficient evidence to submit a claim of lost profits to the jury and that the trial court improperly instructed the jury regarding

---

[17] For that reason, Nerco's failure to discuss various assignments of error relating to particular specifications of breach of contract is not fatal to its right to a retrial on those issues.

the method of calculating those profits. Because evidence of damages on retrial will be limited to Deerfield's lost profits for a one-year period, the issues raised in those assignments should not arise on remand.

The order granting a new trial limited solely to plaintiff's damages for one year is reversed; remanded for new trial on plaintiff's breach of contract and material misrepresentation claims, with damages, if any, limited to one year, and on defendant's counterclaims for breach of contract and defendant's third-party claim based on that theory.

ROSSMAN, J., concurring in part; dissenting in part.

I commend the majority for its effort in this case. I concur with virtually every aspect of its carefully researched and well-reasoned opinion. However, I take issue with the majority's conclusion that evidence of defendants' fraudulent representations concerning the moisture specifications were not admissible under the fraud exception to the Parol Evidence Rule. I do not believe that even Pennslyvania law would allow defendants, given their behavior in this case, to hide behind the shield of the rule. Accordingly, I dissent.

This record is full of testimony that defendants and the Korean buyers had agreed to the higher moisture specifications on which plaintiff insisted, notwithstanding the express terms of the Korean contracts. Plaintiff claims that the higher specifications were a prerequisite to its participation in the transaction and that defendants' representations that higher moisture percentages were tolerable induced it to enter into the contract. Nevertheless, the majority concludes:

> "* * * If Deerfield had intended to rely on oral representations that 7 meant 12 and 12 meant 15, it should have incorporated that agreement in its contract, notwithstanding the express provisions of the Korean contracts to the contrary. It was not necessary to amend the Korean contracts in order for Deerfield and Nerco to agree on when, as between those parties, the moisture penalties would be applicable. Because Deerfield signed the contract directly conflicting with the alleged oral agreement and providing that there were no agreements or representations, it cannot rely on the 'fraud or material misrepresentation' exception to the parol evidence rule, at least under Pennsylvania law. * * *" 72 Or App at 328.

In reaching that conclusion, it relies on two Pennsylvania cases, *Abel v. Miller,* 293 Pa Super 6, 437 A2d 963 (1981), and *LeDonne v. Kessler,* 256 Pa Super 280, 389 A2d 1123 (1978), which hold that the Parol Evidence Rule bars the admission of evidence showing fraud in the inducement when the party seeking to introduce the evidence signed a contract that directly contradicts the oral representations. The reason for the rule is obvious: Parties should protect themselves by conforming the written contract to the actual agreement.

I believe that the facts of this case take it outside the scope of the rule. Plaintiff was told by defendants that the Korean contracts (the ones containing the moisture specifications) could not be changed to reflect the true agreement, because the moisture specifications were set by the government and could never be varied in print, although variations could be agreed to orally. Thus, plaintiff attempted to protect itself but was induced by defendants, fraudulently or otherwise, to refrain from insisting that the contracts be changed.

The majority contends that, even if the Korean contracts could not be changed, plaintiff could have inserted a clause in its contract with defendant detailing the separate oral agreement. Undoubtedly, that would have been the best course of action. However, this court should not hold that plaintiff's failure to follow that course deprives it of relief from defendants' fraud. On the contrary, plaintiff exercised due care when it tried to change the Korean contracts. Defendants' explanation of why that was not possible, combined with numerous assurances that the oral agreement was inviolate, made plaintiff's actions wholly reasonable. I would affirm the trial court's admission of the evidence.