Argued and submitted March 31, 2015; on appeal, reversed and remanded as to derivative claims, otherwise affirmed; on cross-appeal, dismissed as moot December 14, 2016

Richard L. HAWKINS
and Christopher A. Folkestad,
as Trustees of the Timothy P. Moyer Trust,
and derivatively on behalf of
1000 Broadway Building Limited Partnership,
an Oregon limited partnership,
and 1000 Limited Partnership,
an Oregon limited partnership,
*Plaintiffs-Appellants*
*Cross-Respondents,*

*v.*

1000 LIMITED PARTNERSHIP,
an Oregon limited partnership;
1000, Inc., an Oregon corporation;
TMT Development Co., Inc., an Oregon corporation;
West Park Avenue, LLC, an Oregon limited liability company;
Fox Tower, LLC, an Oregon limited liability company;
and Vanessa Sturgeon,
*Defendants-Respondents*
*Cross-Appellants,*
*and*

1000 BROADWAY BUILDING
LIMITED PARTNERSHIP,
an Oregon limited partnership,
*Cross-Appellant.*

Multnomah County Circuit Court
120505664; A155376

388 P3d 347

Eric A. Lindenauer argued the cause for appellants-cross-respondents. With him on the briefs was Garvey Schubert Barer.

Jan K. Kitchel argued the cause for cross-appellant 1000 Broadway Building Limited Partnership and respondents-cross-appellants 1000 Limited Partnership and 1000, Inc. With him on the briefs were Casey M. Nokes and Cable Huston LLP.

Robyn Ridler Aoyagi argued the cause for respondent-cross-appellant Vanessa Sturgeon. With her on the briefs were Daniel H. Skerritt and Tonkon Torp LLP.

J. Kurt Kraemer, Katie Jo Johnson, and McEwen Gisvold LLP filed the briefs for respondents-cross-appellants West Park Avenue, LLC, and Fox Tower, LLC.

Thomas H. Tongue, Brian R. Talcott, and Dunn Carney Allen Higgins & Tongue LLP filed the briefs for respondent-cross-appellant TMT Development Co., Inc.

Before Duncan, Presiding Judge, and Lagesen, Judge, and DeVore, Judge.*

---
* DeVore, J., *vice* Flynn, J.

## DUNCAN, P. J.

This appeal involves an interfamily dispute among the direct and indirect owners of the 1000 Broadway Building, one of several commercial buildings developed by Tom Moyer Sr. The ownership structure for the 1000 Broadway Building involves a labyrinthine arrangement of partnership interests, but, in overly simplified terms, four trusts, one for each of Moyer Sr.'s children, hold interests in the building as limited partners. A company owned by Moyer Sr.'s trust is the general partner that controls the limited partnerships and, consequently, the management and finances of the building itself.

The complaint in this case was filed by the trustee of one of the four trusts, the Timothy P. Moyer Trust, and alleges that the various defendants breached two limited partnership agreements related to the 1000 Broadway Building by, among other things, using the limited partnership's funds for the construction of a different building, Park Avenue West.[1] Defendants moved to dismiss the claims, arguing that plaintiff's claims were barred because a different limited partner—the trust for another of Moyer Sr.'s children—had previously arbitrated and settled claims based on the same set of underlying facts. The trial court treated the motions as motions for summary judgment, agreed with defendants that the claims were barred, and granted summary judgment in defendants' favor. Defendants then sought attorney fees as the prevailing parties, but the trial court denied their requests.

Plaintiff appeals the judgment against him, arguing that (1) the earlier arbitration resolved direct rather than derivative claims, so his current derivative claims are not precluded; (2) similarly, the settlement of those direct arbitration claims was never intended to bar, and could not bar, subsequent derivative claims; and (3) in any event, plaintiff has alleged direct claims that he can assert against the general partner regardless of the previous arbitration

---

[1] This action was originally filed by Thomas Michael Anderson as trustee of the Timothy P. Moyer Trust. He died, and Richard L. Hawkins and Christopher A. Folkestad were substituted in place of Anderson as cotrustees. For readability, however, were refer to "plaintiff" in the singular throughout this opinion.

and settlement. Defendants cross-appeal, arguing that the trial court applied an incorrect legal standard to deny their requests for attorney fees.

For the reasons that follow, we disagree with the trial court's conclusions that plaintiff's derivative claims, as a matter of law, are barred by the settlement agreement in the arbitration proceeding; we conclude instead that the record presents genuine issues of material fact regarding the nature of the claims in that arbitration, as well as questions of fact regarding the scope and effect of the release provision in the settlement. However, we agree with the trial court's conclusion that plaintiff failed to state a cognizable direct claim against the general partner. Accordingly, we reverse in part and remand on appeal. In light of that resolution of plaintiff's appeal, we dismiss the cross-appeal as moot.

## I.  BACKGROUND[2]

### A.  *Moyer-related Entities and Operations*

#### 1.  *The "1000 Entities"*

Moyer Sr., a real estate developer, completed the 1000 Broadway Building in downtown Portland in 1991. The building is owned by One Thousand Broadway Building Limited Partnership (1000 Broadway LP). That limited partnership has 11 limited partners, each of which is a different trust for one of Moyer Sr.'s grandchildren (the "Gallo trusts"); the Gallo trusts, collectively, hold a 50 percent interest in the limited partnership. However, control of the limited partnership—and the remaining 50 percent interest—is held by a general partner, 1000 Limited Partnership (1000 LP).

1000 LP, in turn, has four limited partners, each of which is a trust for one of Moyer Sr.'s children: the Colleen M. Thrift Trust; the Kimberly Moyer Kassab Trust; the Thomas Peter Moyer Trust ("the Tom Moyer Jr. Trust"); and the Timothy P. Moyer Trust. Those trusts each own a 24.75 percent interest in 1000 LP—collectively, 99 percent of the limited partnership. The remaining one percent is held by

---

[2] The background facts are essentially undisputed. To the extent that there is any disagreement about what facts are in the record or what inferences reasonably can be drawn from them, we reserve that discussion for our analysis of particular assignments of error.

1000 LP's general partner, 1000, Inc., a corporation that is owned and controlled by yet another trust, the Thomas P. Moyer Revocable Living Trust ("the Tom Moyer Sr. Trust").

### 2. *Fox Tower*

Moyer Sr. had also developed another building, the Fox Tower, in downtown Portland, which was owned by Fox Tower, LLC. Three of the four trusts for Moyer Sr.'s children—the Colleen M. Thrift Trust, the Kimberly Moyer Kassab Trust, and the Tom Moyer Jr. Trust—were members in Fox Tower, LLC. Moyer Sr. initially was a member and the manager of the LLC, but he later transferred his membership interest to the other members and to a new member, 1000 Broadway LP. As a result, the interests between the entities controlling the two buildings intertwined: 1000 Broadway LP owned a 23.55 percent interest in Fox Tower, LLC.

### 3. *TMT Development, Sturgeon, and the role of Moyer Sr.*

For many years, Moyer Sr. retained exclusive control over the management of his real estate and related enterprises. He was the president and director of 1000, Inc., as well as the trustee of the Tom Moyer Sr. Trust, and he thereby exercised control over 1000, Inc., 1000 LP, and 1000 Broadway LP (collectively, the "1000 Entities"). He also retained the title of manager of Fox Tower, LLC, after he transferred his interest in that LLC. In addition, the day-to-day operations for both 1000 Broadway Building and Fox Tower were delegated to another entity, TMT Development Co., Inc., (TMT Development), which was wholly owned by Moyer Sr.

Beginning in 2002, Moyer Sr.'s granddaughter, Sturgeon, became involved in the management and operations of his real estate enterprises. In 2003, Sturgeon became the president of TMT Development, but Moyer Sr. remained personally involved in the management and operations of the buildings after that time.

### 4. *Transfers of funds among Moyer-related entities*

While in control of his real estate entities, Moyer Sr. freely moved funds among those entities. Between 1999 and

2002, Moyer Sr. directed 26 transfers of funds from 1000 Broadway LP to various recipients for purposes unrelated to the operations of the limited partnership, and there was no agreed-upon rate of interest to be included in the repayment of those transfers.

Between 2006 and 2009, eight additional transfers were made from 1000 Broadway LP for purposes other than operating the limited partnership. This second set of transfers was made to fund the development of another building in downtown Portland, Park Avenue West. A separate entity, West Park Avenue, LLC, had been created in conjunction with that project, but Fox Tower, LLC, wholly owned West Park Avenue, LLC, and separately held title to Park Avenue West. The eight transfers from 1000 Broadway LP for purposes of funding the Park Avenue West project totaled $14,074,822.21. Again, there was no agreed-upon rate of interest for repayment of those transfers by Fox Tower, LLC, or any other beneficiary of the funds.

### 5. *Transfer of control from Moyer Sr.*

In the summer of 2010, Moyer Sr. was replaced by First Republic Trust Company (First Republic) as the successor trustee of the Tom Moyer Sr. Trust, thereby putting First Republic in control of the 1000 Entities. In November 2010, First Republic exercised that control to appoint Sturgeon as the sole director and president of 1000, Inc. Sturgeon was also appointed as the manager of Fox Tower, LLC.

### B. *The Thrift Arbitration and Settlement*

In December 2010, shortly after First Republic replaced Moyer Sr. and appointed Sturgeon to run 1000, Inc., Colleen M. Thrift and John H. Thrift, individually and as cotrustees of the Colleen M. Thrift Trust (claimants or "the Thrifts"), initiated arbitration proceedings based on the trust's partnership interest in 1000 LP and membership interest in Fox Tower, LLC.[3] The claimants made

---

[3] The partnership agreements for 1000 Broadway LP and 1000 LP provided that all disputes between the partners would be arbitrated pursuant to the rules of the Arbitration Service of Portland, whereas the operating agreement for Fox Tower, LLC provided for arbitration under the rules of the American Arbitration

various allegations of mismanagement and improper financial transfers among Moyer-related entities. Because those arbitration proceedings and their resolution are central to the issues on appeal in this case, we recount them in some detail.

1.  *The arbitration claims and 1000 Entities' motion to dismiss*

The claimants' arbitration claims alleged that the diversion of funds from 1000 Broadway LP, through Fox Tower, LLC, to fund the development and construction of Park Avenue West was in breach of the respective partnership and operating agreements for those entities. The claimants also alleged that Sturgeon was managing the properties in violation of agreements among family members to retain nonfamily property management once Moyer Sr. was no longer actively involved in the operation and management of the 1000 Broadway Building and Fox Tower.

The claimants named, as respondents in the arbitration proceedings, many of the parties described above: the 1000 Entities, Fox Tower, LLC, Moyer Sr., Sturgeon, First Republic, and the other children's trusts. The claimants brought claims against some or all of the named respondents—with the exception of the children's trusts—for an accounting, constructive trust, breach of fiduciary duty, and breach of various written agreements.

The children's trusts were named as parties only because the claimants also brought claims for declaratory and injunctive relief, seeking the removal of 1000, Inc., as the general partner of 1000 LP and the removal of Sturgeon as the manager of Fox Tower, LLC. The arbitration claim states that the trusts "were and are limited partners of 1000 LP" and "are named herein for the purpose of binding them to an order removing 1000, Inc., as the general partner of [1000 LP]," and states the same with regard to the removal of Sturgeon.

In response to those claims, the 1000 Entities moved to dismiss on several grounds, including that the claims

Association. The Thrifts initially filed separate arbitration claims with each arbitration service, but they were eventually consolidated by stipulation.

were derivative in nature but were improperly brought as direct claims. Specifically, they argued:

> "The duties and claims alleged belong to the 1000 Entities, and not to the individual limited partners. Therefore, the claims only can be brought derivatively, on behalf of the entities. Because Claimants have failed to do so, their claims should be dismissed."

Moreover, the 1000 Entities argued, the claimants had failed to allege the prerequisite to bringing derivative claims: that the claimants had demanded that the general partner bring the action on behalf of the limited partnership, or that such a demand would have been futile. *See* ORS 70.410 ("In a derivative action, the complaint shall set forth with particularity the effort of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort.").

The claimants, in response, did not directly engage with whether their claims were direct or derivative in nature. Instead, they argued that the arbitration clauses were broad enough to cover the disputes, so the 1000 Entities' "procedural" arguments, which might apply in a court action, were not applicable. The claimants contended:

> "In this case, where the plain language of the arbitration agreements and the surrounding circumstances so compellingly mandate arbitration of *this* dispute with all of *these* parties, the motions to dismiss should be denied * * *."

(Emphases in original.)

The arbitration panel denied the 1000 Entities' motions to dismiss, agreeing with the claimants regarding the breadth of the arbitration clause but also citing a statute that had not been raised in the claimants' response. The panel ruled:

> "Each of the motions to dismiss by the 1000 Entities is denied. The panel is unable to determine, as a matter of law, that no claim has been stated or that claimants lack standing. The panel does not apply derivative rules to this dispute in light of the broad language of the arbitration provisions and the language of ORS 67.160."

The cited statute, ORS 67.160, authorizes a partner to "maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business," to enforce the partner's rights under the partnership agreement or enforce the partner's rights under ORS chapter 67. ORS 67.160(3)(a), (b).

## 2. *The settlement*

The claimants ultimately settled their arbitration claims, and they entered into an agreement that included all of the named respondents—with the notable exception of plaintiff in this case, the Timothy P. Moyer Trust.[4] The settlement provided, in part, that claimants' and the Tom Moyer Jr. Trust's membership interests in Fox Tower, LLC, and West Park Avenue, LLC, would be bought out for the sum of $10 million; that Fox Tower, LLC, would pay $15 million to 1000 Broadway LP, to be distributed to and by its members; that neither TMT Development, nor any member of the immediate or extended family of Moyer Sr., would be an officer or director of 1000, Inc., or manage any of the assets of the 1000 Entities; and First Republic would pay off a promissory note that had been created during the course of the arbitration. The agreement provided that the $10 million and $15 million payments from Fox Tower, LLC, were to be funded by an "equity harvest" from Fox Tower, LLC—that is, by a cash-out refinance of Fox Tower.

The settlement agreement included a paragraph that addressed "Release of Claims; Dismissal of Arbitration." That paragraph, which is later set out in full, 282 Or App at 754-57, provided for releases among the parties and stated that, "[u]pon the effectiveness of releases contained in this paragraph, the Thrifts shall cause the dismissal of the [arbitration claims] with prejudice, and the Parties shall each bear their own share of the arbitration fees, costs and attorney fees."

---

[4] The settlement provides that it is "by and between the following parties": the Thrift Trust; 1000 Broadway LP; 1000, Inc.; the Kimberly Moyer Kassab Trust; the Tom Moyer Jr. Trust; Tom Moyer Jr.; Fox Tower, LLC; First Republic, as Trustee of the Tom Moyer Sr. Trust; Tom Moyer Theaters; TMT Development; and Sturgeon.

Plaintiff, as noted, was not a party to the settlement. In fact, during the negotiations, plaintiff had opposed any settlement that involved an equity harvest from Fox Tower, because it would encumber an asset of Fox Tower, LLC, to the detriment of the company's members, which included 1000 Broadway LP. Plaintiff also opposed any settlement that did not pay 1000 Broadway LP for accrued statutory interest on the unauthorized transfers—a figure in the millions, by plaintiff's calculation.

Counsel for the 1000 Entities informed the chief arbitrator by email that plaintiff was "not a party to this agreement" but represented that, "in light of [plaintiff's] statements that he makes no claims, supports no claims, and seeks limited involvement, we don't view his participation as necessary." Plaintiff's counsel, who had been copied on that email, replied that, although plaintiff "makes no claim in the proceeding, the trustee is supportive of the claims brought by the Thrifts on their merits."[5] The chief arbitrator then abated the proceedings pending the settlement; as part of that order, the chief arbitrator also stated, "The time by which respondents are to file any counterclaims or cross-claims, if any, is extended to November 7, 2011." Plaintiff did not file any counterclaims or crossclaims, and the arbitration proceedings were dismissed with prejudice in October 2011, after the refinancing closed on the Fox Tower.

## C. *Current Proceedings*

### 1. *Pleadings*

Approximately seven months later, in May 2012, plaintiff commenced this action in circuit court, alleging claims based on the same circumstances that gave rise to the arbitration—*i.e.*, that 1000 Broadway LP and Fox Tower, LLC, had diverted funds from those entities to fund the development and construction of Park Avenue West. In the complaint, plaintiff acknowledges the payments made to 1000 Broadway LP in settlement of the arbitration claims

---

[5] Counsel continued by stating, "I also thought I made clear in our call that, while he has made no affirmative claim and we have not presently taken a position on jurisdiction over the Timothy P. Moyer Trust, the trustee is generally supportive of the Thrifts' claim to remove the general partner on its merits."

but alleges that those payments "did not fully compensate" 1000 Broadway LP because the payments did not include interest that had accrued on the improper transfers.

To recover those additional amounts from the unauthorized transfers, plaintiff alleged multiple claims "both directly in his capacity as trustee of the Timothy P. Moyer Trust pursuant to ORS 67.160 and derivatively on behalf of [1000 Broadway LP and 1000 LP] pursuant to ORS 70.400 *et seq.*" The claims against defendants included breach of partnership agreements, breach of fiduciary duty, conversion, money had and received, and requests for a constructive trust and an accounting.[6]

Defendants, in response, moved to dismiss the complaint under ORCP 21 on various grounds. Ultimately, the trial court understood defendants' arguments to raise six issues:

"(1) that the settlement of the Thrift arbitration bars plaintiff's derivative claims because it was the settlement of a derivative claim binding on non-party limited shareholders; (2) that the 1000 Entities executed binding general releases of the defendants in this action in the Thrift arbitration settlement agreement; (3) that plaintiff's acceptance of the proceeds of a portion of the Thrift settlement bars his claims in this action; (4) that plaintiff has not sufficiently pleaded demand futility as required to assert a derivative claim * * *; (5) that plaintiff failed to plead sufficient facts to establish a claim against defendant Vanessa Sturgeon for aiding and abetting a breach of fiduciary duty; and (6) that plaintiff cannot assert direct claims—as opposed to derivative claims—for the injuries alleged."[7]

---

[6] Plaintiff's first claim for relief, against 1000, Inc., and 1000 LP, was for breach of partnership agreements; plaintiff's second claim, against Sturgeon, TMT Development, 1000, Inc., 1000 LP, Fox Tower, LLC, and West Park Avenue, LLC, was for conversion; plaintiff's third claim, against Fox Tower, LLC, and West Park Avenue, LLC, was for money had and received; plaintiff's fourth claim, against 1000, Inc., 1000 LP, and TMT Development, was for breach of fiduciary duty; plaintiff's fifth claim, against Sturgeon, was also for breach of fiduciary duty; plaintiff's sixth claim sought an accounting from 1000, Inc., 1000 LP, Fox Tower, LLC, and West Park Avenue, LLC; and plaintiff's seventh claim sought a constructive trust over the assets of West Park Avenue, LLC.

[7] We quote plaintiff's characterization of the issues, which the trial court expressly adopted in its ruling.

Because the parties submitted evidence related to the Thrift arbitration and settlement, the court treated the motion to dismiss as a motion for summary judgment on the first three of the six issues. In a letter opinion, the court agreed with defendants on nearly every issue. The court first ruled that the previous arbitrations included derivative claims on behalf of 1000 Broadway LP, "whether characterized in that way or not, and the claims in this proceeding are derivative in nature, whether characterized as such or not." The court explained:

> "The arbitration claimants sought the recovery of allegedly unauthorized transfers from 1000 Broadway to fund the development of Fox Tower and Park Avenue West. The same claims have been asserted in this proceeding. The settlement of the arbitration claims included repayment to 1000 Broadway of all of the alleged improper transfers, and the dismissal of those claims with prejudice. *Plaintiff is therefore barred from retrying the claims in this proceeding due to the resolution of the prior claims with prejudice.*"

(Emphasis added.)

The trial court further explained that the "settlement agreement also effectuates the same result." Among other contentions, plaintiff had argued that the agreement, in order to bind nonsettling limited partners like plaintiff, would have required "prior court approval and notice of the settlement terms." The court rejected that argument and ruled that, in any event, plaintiff had received sufficient notice of the settlement but "chose not to challenge the fairness of the settlement, accepted the proceeds of it, and now seeks to pursue the derivative claims a second time. Under these circumstances, fairness and due process were satisfied."

At the close of its letter opinion, the court clarified its ruling. It explained that it was granting defendants' motions on issues (1) (claim preclusion based on settlement of derivative claims in prior litigation) and (2) (effect of general releases by the 1000 Entities); that issue (3) (plaintiff's acceptance of proceeds from the settlement) was merely a factor that underscored the grant of summary judgment on the first two grounds; that issues (4) (demand futility)

and (5) (aiding and abetting against Sturgeon) were moot as a result of the ruling on issues (1) and (2); and that issue (6) (that plaintiff could not assert direct claims for the injuries alleged to the limited partnership) was granted as a "corollary" to the court's ruling on issues (1) and (2). The court then directed counsel for 1000 Broadway LP to prepare a judgment to that effect.

Subsequently, defendants filed motions for an award of attorney fees under ORS 70.415, which authorizes a discretionary award of attorney fees to the prevailing party in a derivative action involving a limited partnership. *See* ORS 70.415 ("The court *may* award reasonable attorney fees to the prevailing party in a derivative action." (Emphasis added.)). After a hearing on the motion and plaintiff's response, the court declined to award attorney fees. The court orally explained that, "despite the fact that I disagree with the plaintiff's positions that they took in this case, I think they were objectively reasonable and they were made in good faith. And a different judge could have come to a different conclusion. And I think the right thing for me to do is leave the parties where they are at this point, as opposed to shifting the fees to the plaintiff." The court entered an order consistent with that oral ruling. It then entered a general judgment in defendants' favor, awarding defendants costs and disbursements but not attorney fees.

## II.   ANALYSIS

### A.   *Appeal*

On appeal, plaintiff argues that the trial court erred with regard to each aspect of its ruling on summary judgment. We analyze, in turn, (1) whether claim preclusion, based on the dismissal of the prior arbitration, bars plaintiff's claims; (2) whether, as part of the settlement, 1000 Broadway LP and 1000 LP released claims against defendants; and (3) whether, in any event, plaintiff can assert direct claims against 1000, Inc.

#### 1.   *Claim preclusion*

The predicate for the trial court's claim preclusion ruling, and for much of defendants' arguments, is that the

Thrift arbitration involved claims that were necessarily derivative claims. That is, the trial court ruled, as a matter of law, that the claims brought in the arbitration were brought by the Thrifts on behalf of 1000 Broadway LP; thus, the settlement of the arbitration and resulting judgment of dismissal of those proceedings preclude subsequent derivative claims based on the same factual transactions. According to plaintiff, that predicate is incorrect, because the arbitration claims were brought as "direct claims" by the Thrifts individually and the arbitration panel understood them as such.

In reviewing the trial court's grant of summary judgment based on claim preclusion, we view the evidence in the light most favorable to plaintiff and consider whether the requirements for claim preclusion have been satisfied as a matter of law. *See Cornus Corp. v. Geac Enterprise Solutions, Inc.*, 252 Or App 595, 599, 289 P3d 267 (2012), *rev den*, 353 Or 428, *cert den*, 143 S Ct 421 (2013); *cf. Johnson & Lechman-Su, PC v. Sternberg*, 272 Or App 243, 246, 355 P3d 187 (2015) (explaining, in the analogous context of issue preclusion, that "[a]t the summary judgment stage, issue preclusion applies as a matter of law only if it can be conclusively determined from the record" that all of the requirements are satisfied).

Under the doctrine of claim preclusion,

"a plaintiff who has prosecuted one action against a defendant through to a final judgment binding on the parties is barred on *res judicata* grounds from prosecuting another action against the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action."

*Rennie v. Freeway Transport*, 294 Or 319, 323, 656 P2d 919 (1982). Thus, "[t]he rule forecloses a party that has litigated a claim against another from further litigation on that same claim on any ground or theory of relief that the party could have litigated in the first instance." *Bloomfield v. Weakland*, 339 Or 504, 511, 123 P3d 275 (2005).

Under Oregon law, the doctrine of claim preclusion extends beyond the actual plaintiff in the earlier litigation. The Supreme Court "has held that a person who was not a party to an earlier action but who was in 'privity' with a party to that earlier action also can be barred on claim preclusion grounds from bringing a second action." *Id.* at 511. As the Supreme Court explained in *Bloomfield*, "[a]n inherent limitation on using the concept of privity in such circumstances, however, is a concern about the fairness of binding a person to a judgment rendered in an earlier case in which he or she was not a party." *Id.* "[P]rivity 'is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include the other within the *res judicata*.' And that relationship is 'close enough' for purposes of preventing the third party from pursuing claims in a second trial 'only when it is realistic to say that the third party was fully protected in the first trial.'" *Id.* (Quoting *Wolff v. Du Puis*, 233 Or 317, 321-22, 378 P2d 707 (1963)).

In this case, plaintiff does not dispute that his complaint and the earlier arbitration are based on the same factual transactions; nor does he dispute that a final adjudication in an arbitration proceeding can have preclusive effect.[8] Thus, we understand the question to be whether this case and that arbitration involve the same *plaintiff*. That question, in turn, depends on whose interests were being represented in the arbitration—an issue that the trial court understood to turn on whether the arbitration claims were, in fact, direct or derivative claims. The trial court ruled that the arbitration claims, "whether characterized in that way or not," were brought on behalf of 1000 Broadway LP rather than the Thrifts individually—and that plaintiff cannot now bring identical claims on behalf of the same partnership.

In plaintiff's view, the trial court mischaracterized the arbitration claims as derivative considering that the 1000 Entities themselves characterized the claims as direct claims, and the arbitration panel declined to apply derivative

---

[8] *See Barackman v. Anderson*, 338 Or 365, 370 n 4, 109 P3d 370 (2005) ("We note that, in general, arbitration proceedings have been accorded preclusive effect in subsequent civil actions for decades.").

rules to the claims, citing ORS 67.160—a statute that refers to direct claims by a partner against a partnership or other partners. Thus, plaintiff argues, the Thrifts were representing their own interests, not those of 1000 Broadway LP and 1000 LP, when they litigated and settled their claims.

In response, defendants argue, as they did in the trial court, that the Thrifts' claims can *only* be characterized as derivative in nature, because the Thrifts did not allege any injuries that were distinct from injuries that the partnerships suffered. Relying on the Supreme Court's decision in *Caplener v. U.S. National Bank*, 317 Or 506, 515, 857 P2d 830 (1993), defendants argue that the "key issue" in distinguishing direct from derivative claims is "whether the claimed damages were derivative of, rather than distinct from, a breach of the agreement with the partnership." Viewed in that light, defendants argue, the claims in the arbitration were necessarily derivative claims brought in the right of the entities rather than the Thrifts individually.

Defendants' arguments, and the trial court's ultimate ruling, focus on how the Thrifts' claims *should* have been understood at the time of the arbitration. However, as we understand principles of claim preclusion, the question is not simply how the arbitration claims should have been characterized, but how they were *actually understood* by the parties and by the arbitration panel. As explained above, preclusion principles bar a person who was not a party to the earlier litigation "only when it is realistic to say that the third party was fully protected in the first trial." *Bloomfield*, 339 Or at 511 (internal quotation marks omitted).

Here, the summary judgment record does not conclusively establish that the interests of 1000 LP or 1000 Broadway LP were "fully protected" by the Thrifts during the prior arbitration. First, as plaintiff points out, the Thrifts never purported to bring their claims on behalf of those partnerships; the claims were alleged "individually and as Co-Trustees of the Colleen M. Thrift Trust." Moreover, the 1000 Entities moved to dismiss on the ground that, based on the injuries alleged, the Thrifts were required to bring the claims on behalf of the partnerships but had "failed to do so." Then, when the arbitration panel ruled on that motion

to dismiss, it denied the 1000 Entities' standing arguments and declined to apply derivative rules, citing a statute, ORS 67.160, that refers to the right of a partner to "maintain an action against the partnership or another partner." ORS 67.160(3).

In addition, there is evidence in the record from which a trier of fact could infer that the Thrifts were willing to settle the arbitration claims only when they, *as individuals*, received a buyout of their interests in Fox Tower, LLC. And the settlement agreement itself, discussed in greater detail below, makes no reference to whether the claims were brought on behalf of the partnerships or belonged to the Thrifts individually, and it is ambiguous with respect to what claims were released by 1000 Broadway LP and 1000 LP. 282 Or App at 754-57.

That evidence, as a whole, creates factual questions as to whose interests the Thrifts, and the arbitration panel, understood the Thrifts to be representing during the arbitration proceeding. For that reason—and regardless of whether, in hindsight, the claims should have been brought on behalf of the partnerships—the summary judgment record does not conclusively establish that 1000 LP or 1000 Broadway LP were in "privity" with the Thrifts such that those partnerships (or parties like plaintiff, seeking to bring claims on behalf of those partnerships) are now precluded by the dismissal of those proceedings from bringing additional claims based on the same set of operative facts. *See, e.g., Maxson v. Travis Cty. Rent Account*, 21 SW3d 311, 317 (Tex App 1999) (at summary judgment stage, defendants failed to conclusively establish that the plaintiffs, who were limited partners, were in privity with other limited partners who had previously litigated against the defendants; "no proof has been offered that the 1988 suit was initiated *on behalf of* the partnership or all limited partners" (emphasis in original)).

Additionally, the 1000 Entities state that plaintiff was precluded "because he was an actual party to the case." As set forth previously, 282 Or App at 742, plaintiff was named as a defendant in the arbitration, along with

the other partners in 1000 LP, and only "for the purpose of binding them to an order removing 1000, Inc., as the general partner of [1000 LP]." As we recently reiterated, "in the absence of a compulsory-counterclaim rule, a party who is a defendant in one action is not barred by claim-preclusion principles from bringing a claim as a plaintiff in another action, *unless* the claim in the second action was necessarily adjudicated in the first action." *Federal Natl. Mortgage v. United States of America*, 279 Or App 411, 416, 380 P3d 1186 (2016) (emphasis in original). Here, defendants have not established that plaintiff was compelled to assert a counterclaim in the arbitration proceeding; although the chief arbitrator set a deadline for filing counterclaims or cross-claims, defendants have not explained how that deadline compelled plaintiff to file those claims for purposes of claim preclusion. Nor have defendants established that any of the legal or factual issues in this case were "necessarily adjudicated"— *i.e.*, actually adjudicated and essential to the determination of the arbitration proceeding. *See Ram Technical Services, Inc. v. Koresko*, 240 Or App 620, 632, 247 P3d 1251 (2011) (explaining that the "necessarily adjudicated" exception "applies when the factual and legal issues that the plaintiff raises in the second case were *actually* adjudicated and essential to the determination of the first case" (emphasis added)). Thus, the fact that plaintiff was a *defendant* in the arbitration is not sufficient to establish claim preclusion on this record.

### 2. Settlement bar (derivative claims)

#### a. The release provision

As described above, the trial court also agreed with defendants' argument that plaintiff's derivative claims against each of the defendants was barred by the release provision in the arbitration settlement. On appeal, we understand plaintiff to challenge that conclusion on two grounds. First, he argues that the settlement was never intended to release claims by 1000 Broadway LP or 1000 LP against defendants; rather, it was intended to release only claims by 1000 Broadway LP or 1000 LP against the Thrifts and Tom Moyer Jr. Second, plaintiff argues that, even assuming that the settlement was intended to bar the type of claims

he now asserts, the agreement is unenforceable against him because it was collusive and procured without notice to him, opportunity to be heard, and approval by the arbitration panel or a court. We conclude that plaintiff's first contention presents a factual question that precludes summary judgment; accordingly, we do not address his alternative arguments regarding enforceability.

We begin with the scope and effect of the release agreement. In construing a release agreement, we follow ordinary rules of contract interpretation. *See Ristau v. Wescold, Inc.*, 318 Or 383, 387, 868 P2d 1331 (1994) ("A release agreement is a contract subject to the rules of contract construction and interpretation."). "The first inquiry that a court makes is whether the agreement is ambiguous. In the absence of an ambiguity, the court construes the words of a contract as a matter of law." *Couch Investments, LLC v. Peverieri*, 359 Or 125, 132, 371 P3d 1202 (2016) (citations omitted).

To determine whether a provision of a contract is ambiguous, we examine the text of the provision in the context of the document as a whole; we also look to extrinsic evidence of the circumstances underlying the contract's formation. *See Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 317, 129 P3d 773, *rev den*, 341 Or 366 (2006). "A contract provision is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation[.]" *Id.* at 313 (quoting *Deerfield Commodities v. Nerco, Inc.*, 72 Or App 305, 317, 696 P2d 1096, *rev den*, 299 Or 314 (1985)). "As a general rule, summary judgment is not appropriate in a contract dispute if the terms are ambiguous." *Copeland Sand & Gravel v. Estate of Angeline Dillard*, 267 Or App 791, 797, 341 P3d 187 (2014), *adh'd to on recons*, 269 Or App 904, 346 P3d 526 (2015).

Before turning to the text and context of the arbitration settlement, we briefly recap the circumstances that gave rise to the settlement. In short, the arbitration involved claims brought by the trustees of the Colleen M. Thrift Trust, which is a limited partner in 1000 LP and was a member of Fox Tower, LLC, against Moyer Sr., Vanessa Sturgeon, First Republic Trust, and various Moyer-related

entities. The dispute focused on mismanagement by Moyer
Sr. and Sturgeon, and the gravamen of the claims was that
they had breached fiduciary duties and the partnership and
LLC agreements by using the funds of 1000 Broadway LP
and Fox Tower, LLC, for other development projects, includ-
ing the Park Avenue West project; the claimants specifically
identified "unauthorized" transfers from 1000 Broadway
LP in 1999 to 2002 and 2006 to 2009. The parties to the
arbitration proceedings—with the notable exception of
plaintiff—negotiated a settlement that resulted in dismissal
of the arbitration claims.

That settlement agreement included the following
provision, paragraph 6:

"6. **Release of Claims; Dismissal of Arbitration.**
Upon payment of the moneys described in paragraph 2
above[9] and delivery of the Note, the Thrifts shall cause the
dismissal of the ASP Claim and the AAA Claim with prej-
udice, *and the Thrifts, Thomas Peter Moyer, the trustees of
the Tom Moyer, Jr. Trust, and the trustees of the Kimberly
A. Moyer Trust, on behalf of themselves, their heirs, and
agents and assigns, shall be deemed to have fully and for-
ever released and discharged each other and [First Republic
(FRTC)], Tom Moyer Theatres, TMT Development Co., Inc.,*

---

[9] Paragraph 2 provides:

"**Payments from Loan Proceeds.** From the proceeds of the Met Life
loan, within five business days after the closing of the loan [First Republic
(FRTC)] shall pay to the Thrifts and the trustees of the Tom Moyer, Jr.
Trust jointly the sum of $10.0 Million in full payment for all of their mem-
bership interests in Fox Tower, LLC, West Park Avenue, LLC and any
entity created to take title to the Chevron property currently owned by
Fox Tower, and the Thrifts and the trustees of the Tom Moyer, Jr. Trust
shall sign an Assignment of their membership interests in said entities to
the respective entities. From the proceeds of the Met Life loan, FRTC shall
also cause $15 Million to be paid by Fox Tower, LLC to 1000 Broadway in
the form of $7.5 Million in cash and the balance in the form of a Note amor-
tized and payable over 5 years at 4% interest with principal and interest
payable quarterly. The Note shall be in a form reasonably acceptable to the
Thrifts and the Tom Moyer, Jr. Trust. 1000 Broadway shall cause these
funds to be distributed to its members in proportion to their interests in
1000 Broadway promptly after the funds are received by 1000 Broadway.
The general partner of 1000 Broadway (1000 Limited Partnership) will
similarly distribute its share of these funds to its partners in proportion to
their interests. The Parties intend that the Thrifts and the Tom Moyer, Jr.
Trust shall be third-party beneficiaries of the obligations of FRTC and Fox
Tower, LLC as provided in this paragraph."

(Boldface in original.)

*Fox Tower, LLC, 1000 Broadway, 1000 LP, 1000[,Inc.], and Sturgeon* and all of their predecessors, successors, members, partners, partners of partners, assigns, agents, officers, directors, employees, insurers, attorneys, affiliates and representatives, and all others for whom those persons and entities might be claimed to be liable, or who might be claimed to be liable for those persons and entities, of and from any and all claims, liens, demands, actions, causes of action, suits or causes of suit of every nature whatsoever, directly or indirectly arising out of, relating to, or connected with any and all acts and/or omissions by any released person or entity based upon facts or events that have occurred, whether known or unknown, to the present date, whether actual or alleged, known or unknown, including but not limited to all claims, liens, demands, actions, causes of action, suits or causes of suit directly or indirectly arising out of, relating to, or connected with the ASP Claim and the AAA Claim. Upon the effectiveness of the foregoing release by the Thrifts and the Tom Moyer, Jr. Trust, FRTC, Tom Moyer Theatres, TMT Development Co., Inc., Fox Tower, LLC, *1000 Broadway, 1000 LP, 1000[, Inc.],* and Sturgeon *on behalf of themselves, their heirs, and agents and assigns, shall be deemed to have fully and forever released and discharged the Thrifts and the Tom Moyer, Jr. Trust, and all of their predecessors, successors, partners, partners of partners, assigns, agents, officers, directors, employees, insurers, attorneys, affiliates and representatives, and all others for whom those persons and entities might be claimed to be liable, or who might be claimed to be liable for those persons and entities, of and from any and all claims, liens, demands, actions, causes of action, suits or causes of suit of every nature whatsoever, directly or indirectly arising out of, relating to, or connected with any and all acts and/or omissions by any released person or entity based upon facts or events that have occurred, whether known or unknown, to the present date, whether actual or alleged, known or unknown, including but not limited to all claims, liens, demands, actions, causes of action, suits or causes of suit directly or indirectly arising out of, relating to, or connected with the ASP Claim and the AAA Claim.* The above release by FRTC shall not affect the right of FRTC to carry out the ordinary administration of the Thomas A. Moyer Revocable Living Trust u/a/d 7/25/07, nor shall that release apply to the beneficiaries of that trust pursuant to ORS 130.110. The rights

of Kimberly Moyer and Timothy Moyer as beneficiaries of that trust shall not be affected by the release by FRTC. Upon the effectiveness of releases contained in this paragraph, the Thrifts shall cause the dismissal of the ASP Claim and the AAA Claim with prejudice, and the Parties shall each bear their own share of the arbitration fees, costs and attorney fees."

(Boldface in original; emphases added.)

There are several notable features of paragraph 6. First, as a matter of structure, the paragraph actually includes two distinct "releases." Stated broadly, one addresses the release of claims by three of the children's trusts (the "settling children"); the other addresses the release of claims by the other various Moyer-related individuals and entities ("the Moyer defendants"), which include 1000 Broadway LP and 1000 LP.

Second, those two releases are structured similarly but not identically. The release by the settling children begins by releasing claims against "each other"—*i.e.*, claims by one of the settling children against another of the settling children—before releasing claims against the Moyer defendants. The release by the Moyer defendants, however, does not include that same text releasing "each other."

Third, after identifying the specific parties who are released, both of the respective releases contain extremely broad recitations of related individuals and entities who are likewise intended to be covered by the releases. The release by the settling children extends to the named Moyer defendants as well as

"all of their predecessors, successors, members, partners, partners of partners, assigns, agents, officers, directors, employees, insurers, attorneys, affiliates and representatives, and all others for whom those persons and entities might be claimed to be liable, or who might be claimed to be liable for those persons and entities[.]"

The release by the Moyer defendants includes identical language, with the exception of any reference to "members." It releases "the Thrifts and the Tom Moyer, Jr. Trust" and

"all of their predecessors, successors, partners, partners of partners, assigns, agents, officers, directors, employees, insurers, attorneys, affiliates and representatives, and all others for whom those persons and entities might be claimed to be liable, or who might be claimed to be liable for those persons and entities[.]"

Fourth, both of the releases are extremely broad with regard to the types of claims covered by the release. They include

"any and all claims, liens, demands, actions, causes of action, suits or causes of suit of every nature whatsoever, directly or indirectly arising out of, relating to, or connected with any and all acts and/or omissions by any released person or entity based upon facts or events that have occurred, whether known or unknown, to the present date, whether actual or alleged, known or unknown, including but not limited to all claims, liens, demands, actions, causes of action, suits or causes of suit directly or indirectly arising out of, relating to, or connected with the ASP Claim and the AAA Claim."

Keeping those four features of paragraph 6 in mind, we return to the question before us: whether, as part of the arbitration settlement, 1000 LP or 1000 Broadway LP released the same claims that plaintiff's complaint now asserts on their behalf.[10] For reasons that will become apparent, we distinguish between plaintiff's claims against defendant 1000, Inc., and claims asserted against the remaining defendants.

b.   Release of claims against 1000, Inc.

Plaintiff's complaint alleges a number of derivative claims against 1000, Inc., the general partner that controlled 1000 LP. According to 1000, Inc., plaintiff's derivative claims against it are barred by paragraph 6 because 1000 LP and 1000 Broadway LP released any claims against "partners" of the Thrifts and the Tom Moyer Jr. Trust, and it is beyond

---

[10] We note that the trial court's letter opinion appears to focus on the release of claims by *the Thrifts,* with the understanding that the Thrifts were bringing derivative claims. However, for reasons explained previously, the record does not allow us to conclude, as a matter of law, that the Thrifts understood themselves to be pursuing claims—or compromising those claims—on behalf of the partnership rather than in their own individual interests. Accordingly, we focus, as do the 1000 Entities, on the release of claims by 1000 LP and 1000 Broadway LP.

dispute that the Colleen M. Thrift Trust and the Tom Moyer Jr. Trust were limited partners in 1000 LP. Plaintiff, on the other hand, argues that the reference to "partners" and "partners of partners" in paragraph 6 was added by counsel for the Thrifts and the Tom Moyer Jr. Trust, and was never intended to secure the release of 1000, Inc.

1000, Inc.'s understanding of the text of the settlement is certainly plausible. The arbitration involved claims by a limited partner of 1000 LP against their general partner, 1000, Inc. In that context, the word "partners" might naturally encompass 1000, Inc., which indisputably is one of the Thrifts' and the Tom Moyer Jr. Trust's partners in 1000 LP. However, extrinsic evidence of the circumstances of formation, as well as the broader context of paragraph 6, persuade us that the agreement is ambiguous as to whether the reference to "partners" or "partners of partners" was intended to include 1000, Inc.

First, as plaintiff points out, to read "partners" as including 1000, Inc., would produce a curious result: 1000, Inc., would be releasing claims against itself. That is, the agreement provides that all of the 1000 Entities—including 1000, Inc.—release the "partners" of the Thrifts and the Tom Moyer Jr. Trust. Thus, 1000, Inc., would appear on both sides of the release, giving up claims against itself.

Although that result might simply be a drafting quirk, the structure of the agreement suggests otherwise. The parties understood how to draft a release among parties who were aligned with one another in the arbitration. With regard to the Thrifts, Thomas Peter Moyer, the trustees of the Tom Moyer Jr. Trust, and the trustees of the Kimberly Moyer Kassab Trust, the release provides that they are deemed to have "fully and forever released and discharged *each other.*" That is, rather than relying on the "partners" or "partners of partners" reference that appears in the release, the parties explicitly referred to a release among the other partners of 1000 LP.

Plaintiff also produced extrinsic evidence that counsel for the Thrifts and the Tom Moyer Jr. Trust was responsible for adding the "partners" and "partners of partners" text

to the agreement. Considering that the Thrifts and the Tom Moyer Jr. Trust were litigating against 1000, Inc., and its president, Sturgeon, it seems improbable that the reference to "partners" was intended and understood to release claims that the 1000 Entities might bring against one another, when the agreement otherwise omitted any reference to a release by the defendants of claims against "each other."

Because the release provision is ambiguous with regard to whether 1000 LP and 1000 Broadway LP released claims against 1000, Inc., when settling the Thrifts' claims, the trial court erred in granting summary judgment on that ground. *See Adair Homes, Inc. v. Dunn Carney*, 262 Or App 273, 286-87, 325 P3d 49, *rev den*, 355 Or 879 (2014) (where, as in this case, the agreement is ambiguous and there is disputed extrinsic evidence relevant to that ambiguity, summary judgment is improper).

c.   Release of other defendants

None of the remaining defendants point to any text in the settlement agreement that releases claims by 1000 LP or 1000 Broadway LP against them. Nor is it apparent from the text how any of them come within the scope of the release by 1000 LP and 1000 Broadway LP. None of them are "partners" or "partners of partners" of the Thrifts or the Tom Moyer Jr. Trust; the only other reference that could arguably encompass those defendants is the reference to "affiliates" of the Thrifts or the Tom Moyer Jr. Trust. However, the term "affiliate," as used in this context, commonly refers to "a company effectively controlled by another or associated with others under common ownership or control," or a "subsidiary."[11] *Webster's Third New Int'l Dictionary*

---

[11] The partnership agreement for 1000 Broadway LP uses the term "affiliate" consistently with that understanding. Paragraph 1.5.4 of that agreement defines the term "affiliate" to mean

"(i) any Person directly or indirectly controlling, controlled by, or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interest of such Person, (iii) any officer, director, or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee, or holder of ten percent (10%) or more of the voting interest of any Person described in clauses (i) through (iii) of this sentence."

35 (unabridged ed 2002). It is not an unambiguous reference to any of the defendants.

In sum, the release provision manifests an unambiguous intent to release claims that the 1000 Entities might bring against the Thrifts and the Tom Moyer Jr. Trust. It does not manifest that same unambiguous intent to release claims that the 1000 Entities might bring against one another or against the other defendants in this action. Accordingly, the trial court erred in granting summary judgment based on the release provision.[12]

3. *Direct claims: No right to pursue an injury to the partnership*

We turn next to the trial court's ruling that plaintiff failed to state cognizable *direct* claims as a limited partner against 1000, Inc., 1000 LP's general partner, for breach of contract and breach of fiduciary duty.[13] The parties' arguments on this question implicate many of the same competing theories that they advanced about the nature of the arbitration claims, but without the overlay of claim preclusion: 1000, Inc., argues that, under established principles of entity law, "a partner cannot convert a derivative claim to a direct claim simply by dropping back to allege

[12] In a section of their briefing regarding the effect of the settlement agreement, West Park Avenue, LLC, and Fox Tower, LLC, rely on the fact that plaintiff was not a limited partner of 1000 Broadway LP, the partnership whose money was allegedly misdirected, and that plaintiff, as a partner in 1000 LP, received a distribution from 1000 Broadway LP as part of the settlement. It is not clear whether those arguments present independent and alternative bases for affirming the judgment, or whether they depend on defendants' argument that 1000 Broadway LP released claims against West Park Avenue, LLC, Fox Tower, LLC, and the other defendants. Because they have not been clearly presented as alternative bases for upholding the judgment, we do not address them separately. Similarly, we note that defendants advanced additional arguments below in support of their motions for summary judgment on the derivative claims, including contentions that the trial court concluded were "moot" based on its reasoning. Because none of those issues are developed on appeal as alternative bases for affirming the court's judgment regarding the derivative claims, we express no opinion on issues beyond claim preclusion and the effect of the settlement agreement with regard to those claims.

[13] Plaintiff's complaint does not clearly delineate which of the claims are brought individually, so we operate under the assumption, as do the parties, that his only direct claims are for breach of contract and breach of fiduciary duty against 1000, Inc. Those claims are based on alleged conduct that preceded the arbitration; that is, he does not allege that the settlement itself constituted a breach of fiduciary duty or the partnership agreements.

that partner's pro-rata share of the overall harm." Plaintiff, for his part, argues that Oregon's partnership statutes allow him to bring direct claims in addition to derivative claims. The court implicitly agreed with 1000, Inc.'s argument. We likewise agree with 1000, Inc., insofar as plaintiff alleged injuries that are entirely derivative of injuries to 1000 LP and 1000 Broadway LP.

Oregon, like many states, has adopted the Revised Uniform Limited Partnership Act (RULPA). The RULPA, which was adopted in 1985, explicitly authorizes limited partners to bring derivative claims. ORS 70.400 provides that "[a] limited partner *may* bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed." (Emphasis added.) Plaintiff, seizing on the word "may," argues that the statute is therefore permissive with regard to alleging a claim as direct or derivative:

> "Under ORS 70.400, a limited partner 'may' bring a derivative action. He is not required to. And under ORS 67.160(2), a partner is specifically entitled to 'maintain an action against a partner for breach of the partnership agreement or for a violation of a duty to the partnership or other partners * * *.' Plaintiff is statutorily entitled to bring his direct claims against 1000, Inc."

We disagree with plaintiff's understanding of the word "may." As used in ORS 70.400, the word is employed only to create the authority for limited partners to act in the right of the partnership—something that is typically reserved for general partners. *See Doyle v. City of Medford*, 347 Or 564, 570-71, 227 P3d 683 (2010) (In general, "the word 'shall' implies that the legislature intended to create an obligation; in contrast, 'may' generally implies that the legislature intended to create only the authority to act."). There is no indication in the text, context, or legislative history of that statute to suggest that the legislature understood the word "may" to be permissive in the sense that a limited partner could choose whether to bring the claim directly or derivatively.

To the contrary, principles of entity law, which were well established by the time that the RUPLA was adopted, have distinguished between claims that must be brought derivatively and claims that must be brought directly. The Supreme Court's decision in *Caplener*, although post-dating the enactment of the RULPA, is illustrative. In *Caplener*, the court considered whether individual partners could state breach of contract claims against a bank for damages that resulted from the bank's breach of an oral promise to lend money to the partnership. The court began its analysis with a discussion of an earlier case, *Johnston v. The Oregon Bank*, 285 Or 423, 591 P2d 746 (1979), which the parties agreed was "on point as to whether the individual partners stated contract claims against Bank." *Caplener*, 317 Or at 513. In *Johnston*, the plaintiff was the principal shareholder in a corporation that, in turn, was the general partner of a lumber company. The plaintiff had claimed that his credit and business standing had been injured, his partnership interest devalued, his partnership wages reduced, and his liability and expenses increased, all as a result of the defendant bank's actions in driving the partnership into bankruptcy. In describing the holding of *Johnston*, *Caplener* quoted the following excerpt from that opinion:

> "'The damages would have occurred to plaintiff just the same in the absence of any guaranty. The damage to plaintiff resulted from plaintiff's interest in the lumber company as well as his contractual relations with other creditors and from the lumber company's bankruptcy and inability to pay its obligations, which bankruptcy was, in turn, caused by the bank's breach of its agreement with the lumber company. Plaintiff's injury either was derivative through his interest in the lumber company or was the result of business relations with others for the lumber company's benefit. It was not the result of his guaranty to the bank.'"

317 Or at 514 (quoting *Johnston*, 285 Or at 427).

The parties in *Caplener* disagreed as to whether the plaintiff-partners were more analogous to the shareholder in *Johnston* or to a plaintiff-guarantor that had been allowed to proceed with a personal claim against a lender in a Court of Appeals decision, *Van Petten v. The Oregon Bank*, 42 Or

App 367, 600 P2d 507, *rev den*, 288 Or 173 (1979). The court in *Caplener* concluded that it was unnecessary to determine whether *Van Petten* had been correctly decided by this court, because *Johnston* was dispositive:

> "From the above-quoted passage in *Johnston*, it is apparent that the key issue is not whether the claim is by a corporation, a shareholder, or a partner, but whether the claimed damages were derivative of, rather than distinct from, a breach of the agreement with the borrowing corporation or partnership. *See Weiss v. Northwest Accept. Corp.*, 274 Or 343, 350, 546 P2d 1065 (1976) (shareholder who guaranteed loan stated no claim against the defendant corporation where injury suffered by shareholder was the same as that suffered by other creditors of the corporation)."

317 Or at 515. The court further explained, "We agree with the trial court's conclusion that the damages alleged by the individuals are derivative of the damages to the partnership. Those damages were the result of plaintiffs' interest in the partnership." *Id.* The partnership, the court held, "is the real party in interest in this case and no individual partner has any separate legally cognizable interest." *Id.* at 515-16.

As plaintiff points out, *Caplener* involved a claim against a third party, whereas his claims are for breach of contractual and fiduciary duties owed by the general partner, 1000, Inc., to its limited partners. We acknowledge that difference, but we are not persuaded that the principle articulated in *Caplener* should be understood so narrowly. That principle was drawn from cases like *Weiss* and *Smith v. Bramwell*, 146 Or 611, 31 P2d 647 (1934), which are based on the "separateness of the corporate entity and its stockholders." *Weiss*, 274 Or at 348. In *Smith*, the court explained that

> "[i]t is a well-established general rule that a stockholder of a corporation has no personal right of action against directors or officers who have defrauded or mismanaged it and thus affected the value of his stock. The wrong is against the corporation and the cause of action belongs to it. Any judgment obtained by reason of such wrongs is an asset of the corporation which inures first to the benefit of creditors and secondly to stockholders."

146 Or at 615. The court reached that conclusion notwithstanding the fact that the plaintiff had relied on the breach of a voting trust agreement; the court explained that "a breach of this voting agreement did not confer upon the plaintiff a right to an individual and direct action, as distinguished from a derivative one, as any loss sustained by plaintiff by reason of the breach was, under the facts alleged, common to all stockholders." *Id.* at 619. *See also Loewen v. Galligan*, 130 Or App 222, 229-30, 873 P2d 1102, *rev den*, 320 Or 493 (1994) ("A wrongful act that diminishes the value of stock and thereby injures shareholders only indirectly, by reason of the prior injury to the corporation, is derivative. Because plaintiffs have not pleaded a special injury, we conclude that the claims they allege are derivative, and they do not have standing to bring direct claims for breach of fiduciary duty." (Internal quotation marks and citations omitted.)).

The principles traced in *Caplener*, although originating in corporation law, are applicable to derivative actions by limited partners, who are analogous to shareholders in relevant respects. *Brooke v. Mt. Hood Meadows Oreg., Ltd.*, 81 Or App 387, 393, 725 P2d 925 (1986), *adh'd to on recons*, 83 Or App 358, 732 P2d 36 (1987) (describing earlier version of Oregon's limited partnership act and recognizing that "[a] limited partner's position is analogous to that of a corporate shareholder, whose role is that of an investor with limited liability *** with no voice in the operation of the enterprise"); *see also* ORS 70.135(1) (providing that a limited partner is not liable for the obligations of the partnership unless the limited partner is also a general partner or participates in control of the business); ORS 67.050(1) ("A partnership is an entity distinct from its partners."). Indeed, the majority of courts that have confronted the issue have applied a test similar to that in *Caplener* to determine whether a claim must be brought directly or derivatively:

> "Limited partners may, of course, enforce their individual rights when these can be distinguished from partnership rights. The prevailing criterion is whether the claimed injury is primarily to the partnership and only indirectly to the partners through their interest in the partnership—a partnership claim—or is direct or unique to the partner(s)—an individual claim."

Alan R. Bromberg and Larry E. Ribstein, IV *Bromberg and Ribstein on Partnership*, § 15.04(f) (Supp 2009-1) (footnotes omitted).

Given that broader context, we are not persuaded by plaintiff's contention that ORS 70.400 allows him to allege the same claims—for breach of fiduciary duty and breach of contract by a general partner, resulting in damages to the partnership—as both direct and derivative claims. To the extent that a claim can be brought in the right of the partnership under ORS 70.400, the plaintiff must pursue that claim as a derivative action rather than as a direct claim for the limited partner's *pro rata* share of the damages.

Consequently, plaintiff's reliance on ORS 67.160 is misplaced. That statute, which is part of the Revised Uniform Partnership Act (RUPA) adopted in 1997, applies to limited partnerships only as a gap-filling statute. *See* ORS 70.615 ("In any case governing limited partnerships that is not provided for in this chapter, the provisions of ORS chapter 67 govern.").[14] Because ORS 70.400 governs the claims in this case, which are derivative in nature, this is not a case that is "not provided for" in ORS chapter 70.

Thus, we conclude that plaintiff's claims for breach of contract and breach of fiduciary duty against 1000, Inc., are properly characterized as claims in the right of the partnership, and the trial court correctly ruled that plaintiff had failed to state a cognizable direct claim for relief.

B. *Cross-appeal*

Finally, we briefly address defendants' cross-appeal, in which they contend that the trial court erroneously denied their request for attorney fees as the prevailing party in a derivative action under ORS 70.415. As a result of our decision on appeal, which reverses the grant of summary judgment on plaintiff's derivative claims, defendants are not presently the prevailing parties. Accordingly, the issues raised on cross-appeal are moot.

---

[14] Because the RULPA was enacted before the RUPA, ORS 70.615 (formerly numbered as ORS 70.465) was amended to cross-reference the new provisions of the RUPA in 1997. Or Laws 1997, ch 775, § 89.

On appeal, reversed and remanded as to derivative claims; otherwise affirmed. On cross-appeal, dismissed as moot.